# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE

IDIL ISSAK,

        *Plaintiff,*

      v.

UNIVERSITY OF
TENNESSEE-KNOXVILLE;
COLLEGE OF ARTS AND SCIENCES;
PATRICK GRZANKA OF THE
COLLEGE OF ARTS AND SCIENCES,
in his Individual and Official Capacities;
MICHAEL BLUM OF THE COLLEGE
OF ARTS AND SCIENCES, in his
Individual and Official Capacities;
BARBARA HEATH OF THE
DEPARTMENT OF
ANTHROPOLOGICAL
ARCHAEOLOGY,
in her Individual and Official Capacities;
INSTITUTIONAL REVIEW BOARD;
INSTITUTIONAL REVIEW BOARD
CHAIR LORA BEEBE,
in her Individual and Official Capacities;
INTERIM INSTITUTIONAL
OFFICIAL OF INSTITUTIONAL
REVIEW BOARD TAMI WYATT, in her
Individual and Official Capacities;
ALTERNATIVE MEMBER OF
INSTITUTIONAL REVIEW
BOARD AND DIRECTOR OF HUMAN
RESEARCH PROTECTION PROGRAM
ROBERT WITHROW, in his Individual and
Official Capacities

        *Defendants.*

Civil Action No. _____

**COMPLAINT**

Plaintiff Idil Issak, a PhD student at the University of Tennessee-Knoxville, seeks declaratory relief, injunctive relief, and nominal damages to halt and redress Defendants' violations of her First Amendment right to freedom of speech.

## INTRODUCTION

1. This case is an as-applied challenge against the University of Tennessee-Knoxville ("University"), its Institutional Review Board ("IRB"), and agents of both for their abridgement of Plaintiff Idil Issak's First Amendment right to freedom of speech.

2. The University requires social science PhD students who seek to engage in research that involves communications with third parties to obtain permission from an IRB **before** conducting the oral and/or written interviews that form the basis of their dissertation, if the dissertation seeks to contribute to generalizable knowledge.

3. Additionally, the IRB requires communicative research conducted internationally to be "culturally appropriate" in the foreign country.

4. Defendants require such IRB approval even though the University's Doctoral Committee previously approved Plaintiff's dissertation research, concluding the proposed communicative research satisfied all academic requirements for the PhD program.

5. Thus, the IRB mandate establishes an unconstitutional licensing scheme that operates as a prior restraint on speech.

6. The IRB mandate also constitutes an unconstitutional content-based, speaker-based, and viewpoint-based restriction on speech and chills Plaintiff's speech.

7. Additionally, the University lacks clear standards for determining whether PhD students engaged in communicative research must obtain IRB approval or for guiding the IRB review process, with the IRB possessing unconstrained discretion to approve or reject an applicant's proposed communicative research.

2

8.     IRB members also lack the necessary knowledge and expertise to evaluate proposed interview questions or surveys or to judge the importance of the research.

9.     In short, the IRB mandate in this case violates almost the full range of free speech doctrines, making it a First Amendment nightmare.

10.     Accordingly, the Official Capacity Defendants should be enjoined from requiring Ms. Issak to obtain IRB approval for her dissertation,[1] and the Court should award Ms. Issak $1 in nominal damages on her Individual Capacity claims.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.[2]

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendant University of Tennessee-Knoxville maintains its principal place of business in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

13.     Plaintiff Idil Issak is a natural person and a resident of Knoxville, Tennessee who is temporarily living in New York City.

14.     Defendant, the University of Tennessee-Knoxville ("University"), is a land grant university established and authorized under the laws of the State of Tennessee, which provides undergraduate and graduate educational programs at various campuses located in the State of Tennessee, including, but not limited to, the campus located in Knoxville, Tennessee.

---

[1] Ms. Issak's challenge is limited to the application of the IRB mandate to students in the social sciences, where the research involves solely communicative research. Plaintiff does not challenge the IRB mandate to the extent it applies to federally funded research or medical research.
[2] The First Amendment is made applicable to the States through the Fourteenth Amendment. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996).

3

15.     Defendant, the College of Arts and Sciences, houses Plaintiff's Anthropology PhD program.

16.     Defendant Patrick Grzanka, Divisional Dean for Social Sciences in the College of Arts and Sciences, is sued in both his individual and official capacities.

17.     Defendant Michael Blum, College of Arts and Sciences Associate Dean for Research and Creative Activity, is sued in both his individual and official capacities.

18.     Defendant Barbara Heath, Department Head of Anthropological Archaeology, is sued in both her individual and official capacities. [3]

19.     Defendant Institutional Review Board ("IRB") is an administrative body within the University's Human Research Protection Program.

20.     Defendant Dr. Lora Beebe, Chair of the IRB, is sued in both her individual and official capacities.

21.     Defendant Robert Withrow, alternate member of the IRB and Director of Human Research Protection Program, is sued in both his individual and official capacities.

22.     Defendant Tami Wyatt, Interim Institutional Official of the IRB, is sued in both her individual and official capacities.[4]

23.     University Defendants and IRB Defendants all reside and/or work in Knoxville, Tennessee.

## STATEMENT OF FACTS

**A.      Plaintiff Idil Issak's Background**

---

[3] Defendants University, College of Arts and Sciences, and Divisional Dean Grzanka, Associate Dean Blum, and Department Head Heath in their official capacities are referred to jointly as "University Defendants."

[4] Defendants IRB, Chair Beebe, Alternate Member and Director Withrow, and Interim Institutional Official Wyatt in their official capacities are referred to jointly as "IRB Defendants."

4

24. Plaintiff Idil Issak was born in Somalia but relocated to the United States in 1994 and is a United States citizen.

25. During her first year of college, Ms. Issak attended American University in Dubai, located in the United Arab Emirates ("UAE").

26. After her first year of college, Ms. Issak returned to the United States; she then obtained a Bachelor's Degree in Journalism from the University of Memphis, and a second Bachelor's Degree in Anthropology from the University of Tennessee.

27. Upon graduation, Ms. Issak returned to the UAE on a work visa where she witnessed foreign female domestic workers suffering human rights abuses.

28. This injustice motivated Ms. Issak to enter the PhD program at the University so she could research, understand, and write about the mental and physical burdens carried by enslaved and/or abused foreign female domestic workers in the UAE.

29. Currently, Plaintiff is in her seventh year of a PhD program in Cultural Anthropology at the University of Tennessee-Knoxville.

30. Plaintiff's proposed PhD dissertation is titled *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to Exploitation in the UAE* and focuses on the plight of domestic workers in two of the seven United Emirates, Sharjah and Ajman.

**B. The University Approved Ms. Issak for PhD Admission to Candidacy**

31. Obtaining a PhD at the University of Tennessee may take as many as eight years and costs approximately $320,000 for an in-state resident and approximately $464,000 for an out-of-state resident.

32. PhD students must take 48 credit hours of coursework and 24 credit hours related to their dissertation.

5

33.     Non-course requirements include annual performance reviews, comprehensive written exams with oral defense components, submission of a formal dissertation proposal, and an oral presentation and oral defense of the candidate's dissertation.

34.     Before a student can apply for "Admission to Candidacy," a PhD candidate must: a) complete course work and satisfy GPA requirements; b) take and pass the Comprehensive Examination; c) establish a Doctoral Committee; and d) meet the residency requirement. Only after satisfying those conditions may a student defend his or her dissertation.

35.     The Comprehensive Examination has both a written and oral component.

36.     The written portion of the exam must be completed within seven days from when the student begins the exam.

37.     Students must complete the oral portion of the exam within two months after completion of the written portion.

38.     Plaintiff completed both portions of the Comprehensive Examination by June 28, 2024.

39.     A Doctoral Committee must also approve a student's dissertation proposal within one semester of the student's completion of his or her Comprehensive Examination.

40.     The dissertation proposal includes the framework, background, questions to be answered, and method of research for the PhD student's planned dissertation.

41.     The entire Doctoral Committee must approve the PhD student's dissertation proposal.

42.     Plaintiff's advisor, Dr. Raja Swamy, approved Ms. Issak's dissertation proposal on November 13, 2023.

43.     That same day, the Doctoral Committee approved Ms. Issak's dissertation proposal.

44. Plaintiff's Doctoral Committee consists of researchers with expertise on the subject matter of Plaintiff's dissertation.

45. Dr. Tamar Shirinian is part of the Doctoral Committee and has a background in trauma research, which aligns with Plaintiff's dissertation goal of understanding the trauma Ethiopian domestic workers have undergone.

46. Dr. Asafa Jalata is part of the Doctoral Committee and is a leading scholar on Ethiopia, and his work as a sociologist aligns with the goals of anthropological research.

47. Dr. Kristin Monroe is part of the Doctoral Committee and is an Associate Professor of Anthropology at the University of Kentucky. Her expertise lies in doing research in the Middle East with vulnerable populations, which aligns with Plaintiff's dissertation goals.

48. Plaintiff successfully defended her dissertation proposal on November 13, 2023.

49. On April 29, 2025, the University officially admitted Ms. Issak to PhD candidacy, establishing the Summer of 2026 for the conferral of her degree.

50. To obtain her degree, Ms. Issak must first complete and defend the dissertation the Doctoral Committee approved.

51. Plaintiff, however, is stymied from conducting the necessary communicative research for her dissertation because the University Defendants require Plaintiff to first obtain IRB approval.

C. **The Institutional Review Board's Requirements for Social Science Research**

52. The IRB is an administrative body under the University's Human Research Protection Program.

53. The IRB "has the authority to approve, disapprove, monitor, and require modifications in all research activities that fall within its jurisdiction[.]"[5]

---

[5] *What is the IRB?*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/for-irb-members/.

7

54. The University provides the IRB jurisdiction to oversee research that involves communicating with third parties where the communicative research involves a "systematic investigation" "designed to contribute to generalizable knowledge."[6]

55. A systematic investigation is defined by the University as "[a]n activity that involves a prospective study plan that incorporates data collection, either quantitative or qualitative, and data analysis to answer a study question."[7]

56. Generalizable knowledge is defined by the University as "[i]nvestigations … designed to draw general conclusions (i.e., knowledge gained from a study may be applied to populations outside of the specific study population), inform policy, or generalize findings."[8]

57. However, not all communicative research requires IRB approval: The University provides examples of research that may fall outside the purview of the IRB, such as a biography or oral history "if the information being collected focuses directly on the specific individuals about whom the information is collected and not on generalizing the information or findings to other individuals."[9]

58. The University's definition of "generalizable knowledge" is vague, leaving the IRB with unconstrained discretion to determine whether communicative research requires IRB approval.

59. Upon information and belief, the IRB *initially* concluded that Plaintiff's proposed communicative research involved "systematic investigation" designed to contribute to "generalizable knowledge."

---

[6] *Human Research Protection Program FAQs*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/human-research-protection-program-faqs/ (emphasis deleted).
[7] *Do I Need IRB Review?*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/for-researchers/before-you-begin-2/activities-requiring-irb-review/.
[8] *Id.*
[9] *Id.*

8

60.     Upon information and belief, the University Defendants require IRB approval of Plaintiff's communicative research even though the Doctoral Committee—with expertise aligned with Plaintiff's dissertation topic—already approved Ms. Issak's dissertation proposal.

61.     To obtain IRB approval, PhD candidates must submit to the IRB: a) a completed IRB application; b) recruitment and screening materials for the proposed research; c) informed consent documents; and d) data collection materials.

62.     When a student's research subjects are located outside the United States, the IRB requires the student to obtain 1) a letter stating whether the local government requires review, and 2) a memo of cultural appropriateness.

**D.     Plaintiff's Interaction with the IRB**

63.     Plaintiff submitted her first application to the IRB on or about February 29, 2024, has amended her application to the IRB more than five times, and has yet to obtain IRB approval.

64.     Plaintiff initially sought expedited review from the IRB, but the IRB denied her request for expedited review.

65.     Upon information and belief, the individual or individuals who reviewed Plaintiff's application for expedited review lacked a scholarly expertise related to subject matter of Plaintiff's proposed research despite the fact that the University's IRB Standard Operating Procedures ("SOP") provide that "[d]esignated reviewers must be professionally competent (i.e., experienced with and having demonstrated the ability to apply IRB review requirements and with *appropriate scientific or scholarly expertise*) to conduct expedited reviews."

66.     Upon information and belief, the IRB also did not have a cultural anthropologist review Ms. Issak's proposed communicative research before seeking clarifying and/or additional information, even though the SOP provides that "[w]hen the IRB is presented with a research study which may be outside of the knowledge base or representative capacity of the IRB members, an

9

outside consultant will be sought[.] … Research studies for which appropriate expertise cannot be obtained for a given meeting will be deferred to another meeting when appropriate expertise is available."

67.    Upon information and belief, none of the IRB members who reviewed Ms. Issak's proposed research had knowledge of the relevant laws of the UAE.

68.    Upon information and belief, none of the IRB members who reviewed Ms. Issak's proposed research spoke or read Arabic or Amharic, even though the SOP provide that "[t]o ensure that translated documents are accurate, the IRB may choose to require a certified translation, to have an independent back-translation, or to have a review of the translated documents by an IRB member or other person who is fluent in the language."

69.    The IRB later refused to consider Ms. Issak's application because it wrongly believed she needed approval from the UAE to conduct research in the UAE.

70.    Specifically, the May 17, 2024, IRB decision letter stated "Pursuant to the DOH Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained."

71.    Plaintiff responded to IRB Chair Dr. Beebe by explaining that the DOH Standard only applies to the Abu Dhabi emirate and that because she was only conducting her proposed communicative research in two different emirates, namely Sharjah and Ajman, approval by an Ethics Committee in the UAE was not required.[10]

72.    The IRB informed Plaintiff in a May 31, 2024, letter that "[i]n order to be placed on the full board agenda, all provisos within said outcome letter must be addressed and submitted by the required deadline of June 3, 2024. This includes proviso 1, which states, 'Pursuant to the DOH

---

[10] The UAE is a country in the middle east comprised of seven emirates, each of which has unique laws.

Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained.'"

73.    The IRB's May 31, 2024 decision letter added: "As the student investigator has indicated the emirates in which research will be conducted do not require Ethics Committee approval, the IRB requires that the Memo of Cultural Appropriateness be revised to clearly state the emirates for which the signer has cultural and regulatory knowledge and whether or not those emirates require Ethics Committee approval to conduct the research procedures as described in the protocol."

74.    The IRB refused to consider Plaintiff's application without this memorandum even though the DOH Standard expressly stated its purpose is "[t]o define the regulatory requirements for the conduct of clinical research involving human subjects in the Emirate of Abu Dhabi," and even though Plaintiff's proposed research did not involve individuals in the Emirate of Abu Dhabi.

75.    On June 3, 2024, Plaintiff provided the IRB a letter confirming the DOH Standard does not apply to Plaintiff's research because she is not conducting research in Abu Dhabi: That letter stated "[w]hile there are Emirate-level regulations that apply to human-subjects research in Abu Dhabi, the same do not apply to research in Sharjah or Ajman."

76.    Thereafter, the IRB continued to reject Ms. Issak's application, requiring her to provide additional or clarifying information.

77.    The last decision letter from the IRB, dated August 2, 2024, and signed by Defendant Withrow on behalf of the IRB, stated, among other things: "Your application currently does not show that the project meets the definition for human subjects research as a systematic investigation designed to contribute to generalizable knowledge."

78.    Although the IRB's "authority to approve, disapprove, monitor, and require modifications in all research activities" is limited to activities that "fall within its jurisdiction," and although the IRB jurisdiction is limited to research that involves a "systematic investigation" "designed

11

to contribute to generalizable knowledge," the IRB in its August 2, 2024, letter did not disclaim jurisdiction over Plaintiff's research; to the contrary, the IRB's letter instructed Plaintiff to further revise her application, leading Plaintiff to reasonably fear that if she begins her communicative research without IRB approval, she will be subject to discipline and jeopardize her PhD.

79.     Upon information and belief, the IRB, as a body, has yet to review Ms. Issak's application.

80.     The IRB, as a body, only reviews applications once per month, so every time individual members of the IRB request clarification or additional information, it delays consideration by the full board and in turn Plaintiff's research and her ability to graduate.

**E.     But for the Institutional Review Board's Abridgement of Plaintiff's Free Speech Rights, Plaintiff Could Begin Her Dissertation Research**

81.     Although the Doctoral Committee has approved Ms. Issak's dissertation proposal, she cannot begin her research until the IRB approves her application.

82.     Conducting research absent IRB approval can result in "[being] subject to non-compliance and research misconduct reporting to university officials."[11]

83.     IRB approval is necessary for the successful completion of a PhD program because students cannot get a PhD until they pass a final oral examination, and they cannot take that examination until they write their dissertations, but they cannot begin their research for the dissertation until the IRB approves the application.

84.     PhD candidates must complete the program within eight years of enrollment. Plaintiff is currently in her seventh year and still awaits approval by the IRB.

---

[11] *Human Research Protection Program FAQs*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/human-research-protection-program-faqs/.

12

85. The Defendants' requirement for IRB approval has delayed Plaintiff's ability to complete her research and puts at risk her ability to timely complete the PhD program.

## F. The IRB Regulates Fully Protected Speech, Not Conduct

86. Ms. Issak's efforts to develop and contribute to generalizable knowledge not only trigger coverage under the IRB policy, but also, in and of itself, constitute speech within the meaning of the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment.").

87. In her dissertation, Plaintiff hopes to gather data through verbal communication that allows her to evaluate the adversities—mental and physical—faced by domestic workers in the UAE, grouping the women qualitatively by common experiences.

88. Plaintiff's research seeks to develop and contribute to generalizable knowledge by use of interviews and her written analysis of the interviews and thus Plaintiff's research consists wholly of protected speech. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (explaining that "[t]he protection of the First Amendment is not limited to written or spoken words"); *see also Burson v. Freeman*, 504 U.S. 191, 207 (1992) (referring to "exit polling" as "other types of speech"); *Connick v. Myers*, 461 U.S. 138, 149–50 (1983) (characterizing a survey as "speech").

89. Further, the fact that Ms. Issak's "speech" consists of questions, is of no matter for "[q]uestions, no less than forcefully stated opinions and facts, carry messages." *See Connick*, 461 U.S. at 152.

90. Because Plaintiff's speech seeks to "develop or contribute to generalizable knowledge," the University requires IRB approval.

91.     Upon information and belief, Defendants would not require Ms. Issak to obtain IRB approval if she intended to write an oral history summarizing her interviews and/or did not seek to contribute to generalizable knowledge.[12]

92.     The Supreme Court has made clear that what "trigger[s] coverage," controls the determination of whether a regulation governs "speech" or "conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Thus, if the so-called "conduct" that "trigger[s]" coverage "consists of communicating a message," then the law regulates speech. *Id.*

93.     Because whether Defendants required Plaintiff to obtain IRB approval rests on the content of her speech, namely whether her communication research seeks to "develop or contribute to generalizable knowledge," the IRB policy regulates speech and not conduct.

## G.     The University's IRB Mandate Is an Unconstitutional Licensing Requirement and Thus a Prior Restraint

94.     Requiring Ms. Issak to obtain IRB approval prior to engaging in speech related to her PhD dissertation establishes a licensing system and constitutes an unconstitutional prior restraint.

95.     Plaintiff cannot begin her research until the IRB approves it, otherwise she is subject to discipline and jeopardizes her PhD, as conducting research absent IRB approval means being "subject to non-compliance and research misconduct reporting to university officials."[13]

96.     Such authoritarian licensing of the "publication of literature" was practiced "[i]n Tudor England[,] [where] officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan[,]" however, it was thoroughly rejected in our Republic. *Stanford v. Texas*, 379 U.S. 476, 482 (1965).

---

[12] *See Do I Need IRB Review?*, *supra* at n.7.
[13] *Human Research Protection Program FAQs*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/human-research-protection-program-faqs/.

97.     The act of licensing "is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733–34 (1931) (quotations and citations omitted).

98.     Accordingly, the Founding generation ratified the First Amendment to protect against such licensing mandates.

99.     The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut,* 310 U.S. 296, 305 (1940), by the licensing authority, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great" to be permitted, *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

100.     Licensing, or prior review, of speech is additionally unconstitutional when it is discretionary, as "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotations and citations omitted).

101.     A restriction that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

102.     The University, however, failed to provide the IRB narrow, objective, and definite standards to guide its review of applications and instead granted the IRB unconstrained discretion to both determine whether IRB approval is required and then to appraise facts, exercise judgment, and formulate opinions concerning whether to approve the proposed communicative research.

103. Specifically, the SOP provide that "[r]eviewing officials may strengthen requirements and/or conditions, or add other modifications before approval, or may require approval by an additional committee, office, or person."

104. In refusing to approve Ms. Issak's application, the IRB made numerous judgments that involved significant and unfettered discretion, such as determining the "importance of the knowledge" to be gained and if the "[r]isks to the subjects" from interviews "are reasonable in relation to anticipated benefits" to the subject.[14]

105. Further, the IRB outsourced its discretion to approve communicative research to non-citizens by requiring applicants to obtain letters of "cultural appropriateness" from a local authority.

106. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

107. The University's requirement that Ms. Issak obtain approval of her speech from the IRB suppressed and chilled Ms. Issak's speech, prompting her to narrow the areas of her inquiry: Ms. Issak's final application to the IRB contained only 25% of the content she originally intended to research.

108. Upon information and belief, the IRB requirement has chilled some other graduate students' speech by prompting them to modify their proposed dissertations or causing them to opt for degrees that do not require IRB approval.

## H. The IRB Policy Establishes an Unconstitutional Condition to Obtaining Her PhD

---

[14] *Full Board Review*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/full-board-review/#:~:text=Risks%20to%20subjects%20are%20minimized,for%20diagnostic%20or%20treatment%20purposes.

16

109. For Plaintiff to begin her dissertation research and graduate, she must succumb to the speech restraints dictated by the IRB. In other words, the IRB has conditioned the furtherance of Plaintiff's PhD on her forfeiting her First Amendment rights.

110. The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

111. "The government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019).

## I. The University's IRB Requirement Constitutes a Content-Based Restriction on Speech Subject to Strict Scrutiny

112. The IRB policy creates a content-based regulation because whether the research requires IRB approval depends on the content of the speech.

113. Specifically, the IRB policy distinguishes between communicative research designed to produce "generalizable" versus "non-generalizable" knowledge, requiring IRB approval for the former communicative research but not the latter.

114. Thus, "[s]cholarly and journalistic activities" such as "oral history, journalism, biography, literary criticism, legal research, and historical scholarship" generally do not require IRB approval because they purportedly do not produce "generalizable" knowledge.[15] *Cf.* 45 C.F.R. § 46.102(l)(1).

115. "Regulation of speech is content-based and therefore subject to strict scrutiny 'if a law applies to particular speech because of the topic discussed or the idea or message expressed'; some

---

[15] *Do I Need IRB Review?*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/for-researchers/before-you-begin-2/activities-requiring-irb-review/

obvious facial distinctions based on a message include 'defining regulated speech by particular subject matter' or 'by its function or purpose.'" *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)).

116.    The Supreme Court in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), found a state tax content-based where the statute drew a distinction similar to the "generalizable"/"non-generalizable" knowledge one at issue in the IRB policy.

117.    In *Ragland*, the Court held that a tax on "general interest" magazines, but not on religious, trade, professional, and sports ones, was content based. *Id.* at 223, 230. Put plainly, "a magazine's tax status depend[ed] entirely on its *content.*" *Id.* at 229.

118.    In that case, to determine whether the tax applied to a magazine, the "enforcement authorities [had to] necessarily examine the content of the message that [was] conveyed." *Id.* at 230 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

119.    Under *Ragland*, then, the IRB policy's distinction between "generalizable" and "non-generalizable" knowledge represents a content-based restriction on speech.

120.    "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

121.    Further, such content-based regulations are "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

122.    "Only rarely are statutes sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984).

**J.**     **The University's IRB Requirement Is a Speaker-Based Restriction of Speech Subject to Strict Scrutiny**

123.     Not only is the IRB policy content-based, but it is also speaker-based.

124.     The IRB policy imposes speaker-based restriction similar to those at issue in *Ragland*—just as the tax scheme in that case treated "general interest" magazines "less favorably than others," 481 U.S. at 229, the IRB policy treats speakers addressing "generalizable knowledge" less favorably than others.

125.     Specifically, the IRB policy treats speech by historians, journalists, and behavioral scientists differently, with historians and journalists generally not subject to the IRB policy because they do not intend to contribute to "generalizable knowledge." *Cf.* Letter from Michael A. Carome, Assoc. Dir. for Regul. Affairs, Off. for Hum. Rsch. Prots. to Linda Shopes and Donald Ritchie, Leaders of the Oral History Ass'n (Sept. 22, 2003)[16] (hereinafter, "Oral History Letter").

126.     Even though historians conducting oral-history research systematically conduct interviews and "reach for meaning that goes beyond the specific subject of their inquiry," the government assumes that such historians, unlike researchers in the behavioral sciences, "do not reach for generalizable principles of historical or social development, nor do they seek underlying principles or laws of nature that have predictive value and can be applied to other circumstances for the purpose of controlling outcomes."[17]

127.     The University requires IRB approval of Plaintiff's communicative research because Ms. Issak seeks to qualitatively group participants to identify patterns, to delineate common themes, and then to speak about generalizable principles in her dissertation.

_____

[16] https://research.unl.edu/orr/docs/OHRPResponsetoOralHistories.pdf
[17] *Id.*

128.    Upon information and belief, the University would not require historians and journalists who conduct equivalent communicative research to obtain IRB approval if they do not seek to speak about generalizable principles.

129.    Accordingly, the IRB policy requires Plaintiff to obtain IRB approval for her research because she is a qualitative researcher and not an historian or a journalist. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

130.    Thus, while the IRB requirement purportedly seeks to protect individuals interviewed as part of communicative research, the application of the IRB in the social sciences lacks any congruence with that goal.

131.    Speaker-based discrimination is only permissible if the IRB policy satisfies strict scrutiny. *See Reed*, 576 U.S. at 168–70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)) (holding "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference").

**K.    The University's IRB Policy Establishes a Viewpoint-Based Regulation of Speech Subject to Strict Scrutiny**

132.    Further, the IRB's policy establishes a viewpoint-based regulation of speech by refusing to consider research conducted internationally unless the applicant obtains a letter stating the research is deemed "culturally appropriate" in the country in which the research will take place, making third parties the arbiters of what communicative research is allowed based on the viewpoint of the research.

133.     Government discrimination among viewpoints—those targeting "particular views"—is a "more blatant" and "egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

134.     "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

135.     Further, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

136.     "Both content- and viewpoint-based discrimination are subject to strict scrutiny. … No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (internal citations omitted).

137.     The IRB requirement that an applicant obtain a statement of the cultural appropriateness of the research is thus a further unconstitutional abridgment of speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (explaining the very "purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals['] … ideas from suppression . . . at the hand of an intolerant society").

**L.     University's Officials Ratified the IRB's Abridgement of Plaintiff's Free Speech Rights**

138.     After the IRB refused to approve Plaintiff's application and directed her to provide additional and/or clarifying information, upon information and belief, Defendant Patrick Grzanka, the Divisional Dean for Social Sciences in the College of Arts and Sciences, Defendant Michael Blum, the College of Arts and Sciences Associate Dean for Research and Creative Activity, and Defendant

Barbara Heath, the Department Head of Anthropological Archaeology, discussed the IRB review process with Defendant Dr. Lora Beebe, Chair of the IRB, and Defendant Robert Withrow, alternate member of IRB and Director of Human Research Protection Program.

139.    Upon information and belief, Defendants Grzanka, Blum, and Heath agreed that Ms. Issak must obtain IRB approval and that the IRB held sole authority, in its discretion, to approve or reject her application.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Plaintiff's Right to Freedom of Speech
### In Violation of First Amendment
### Against University Defendants in Their Official Capacities

140.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

141.    University Defendants maintain an unconstitutional custom or policy that requires IRB approval for social science communicative research that seeks to "develop or contribute to generalizable knowledge."

142.    University Defendants maintain an unconstitutional custom or policy that requires PhD social science candidates conducting communicative research internationally to establish such communicative research is "culturally appropriate."

143.    Pursuant to their custom or policy, the University Defendants established an unconstitutional licensing scheme and prior restraint to Plaintiff's speech by prohibiting Plaintiff from conducting her communicative research for her already-approved dissertation proposal absent IRB approval, and by delegating unlawful, unconstrained, and unmoored discretion to the IRB, chilling Plaintiff's speech.

22

144.    Pursuant to their custom or policy, University Defendants unconstitutionally conditioned Plaintiff's ability to complete her already-approved dissertation proposal on IRB approval of her proposed speech.

145.    Pursuant to their custom or policy, University Defendants unconstitutionally applied a content-based regulation to Plaintiff's speech by requiring her to obtain IRB approval for her communicative research because Plaintiff intends to write about "generalizable" knowledge in her dissertation; such approval would not be required if Plaintiff sought to write about "non-generalizable" knowledge.

146.    Pursuant to their custom or policy, University Defendants unconstitutionally applied a speaker-based regulation to Plaintiff's speech: Ms. Issak, a social scientist communicating about generalizable knowledge must obtain IRB approval, while researchers who do not seek to speak about generalizable knowledge need not obtain IRB approval.

147.    Pursuant to their custom or policy, University Defendants unconstitutionally applied a viewpoint-based regulation to Plaintiff's speech by requiring Plaintiff to establish her proposed research is "culturally appropriate."

148.    University Defendants lack a compelling governmental interest in requiring IRB approval for Plaintiff's research and in requiring Plaintiff to establish her research is "culturally appropriate."

149.    Plaintiff seeks prospective relief in the form of a declaratory judgment holding the University Defendants' IRB mandate requiring approval of social science PhD candidates' communicative research, who are not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment, and entry of a

permanent injunction barring the University from requiring Plaintiff to obtain IRB approval for her communicative research.[18]

## SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983: Abridgement of Plaintiff's Right to Freedom of Speech**
**In Violation of First Amendment**
**Against Defendants Grzanka, Blum, and Heath in Their Individual Capacities**

150.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

151.    Defendants Grzanka, Blum, and Heath deprived Ms. Issak of her First Amendment right to freedom of speech by applying the University's unconstitutional IRB mandate to Plaintiff.

152.    Defendants Grzanka, Blum, and Heath acted under color of state law and, upon information and belief, were personally involved in the decision to apply the University's unconstitutional IRB mandate to Plaintiff, and to provide the IRB with unconstrained and unmoored discretion to approve or deny Plaintiff's application.

153.    It has long been clearly established that discretion awarded a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.") (quotations and citations omitted). Further, "[w]hile [p]rior restraints are not unconstitutional *per se* … [a]ny system of prior restraint … comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (quotations and citations omitted).

---

[18] Should University Defendants' continued violation of Plaintiff's First Amendment rights prevent her from completing her dissertation within the eight-year time frame established by the University, Plaintiff will seek preliminary relief to avoid that irreparable harm.

154.    Defendants Grzanka, Blum, and Heath acted under color of state law and, upon information and belief, were personally involved in the decision to unconstitutionally condition Plaintiff's ability to complete her already-approved dissertation proposal on IRB approval of her proposed speech.

155.    It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911.

156.    Defendants Grzanka, Blum, and Heath acted under color of state law and, upon information and belief, were personally involved in the decision to apply an unconstitutional content-based regulation to Plaintiff's speech by requiring her to obtain IRB approval for her communicative research because Plaintiff intends to write about "generalizable" knowledge in her dissertation; such approval would not be required if Plaintiff sought to write about "non-generalizable" knowledge.

157.    It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

158.    Defendants Grzanka, Blum, and Heath acted under color of state law and, upon information and belief, were personally involved in the decision to apply an unconstitutional speaker-based regulation to Plaintiff's speech: Ms. Issak, a social scientist communicating about generalizable knowledge, must obtain IRB approval, while researchers who do not seek to speak about generalizable knowledge need not obtain IRB approval.

159.    It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-

identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

160.    Defendants Grzanka, Blum, and Heath acted under color of state law and, upon information and belief, were personally involved in the decision to apply an unconstitutional viewpoint-based regulation to Plaintiff's speech by requiring Plaintiff to establish her proposed research is "culturally appropriate."

161.    It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

162.    Plaintiff seeks nominal damages of $1 from each Individual Capacity Defendant for the above violations of her First Amendment rights.

### THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983: Abridgement of Plaintiff's Right to Freedom of Speech
In Violation of First Amendment
Against IRB Defendants in Their Official Capacities**

163.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

164.    IRB Defendants maintain a custom or policy that requires social science PhD candidates who conduct communicative research as part of their dissertations to obtain IRB approval if the students' dissertation seeks "to develop or contribute to generalizable knowledge."

165.    IRB Defendants maintain a custom or policy that requires social science PhD candidates to obtain a letter stating that the interviews they intend to conduct internationally are "culturally appropriate."

166.    Pursuant to their custom or policy, IRB Defendants unconstitutionally require Plaintiff to proceed through the IRB process and obtain prior approval of Plaintiff's proposed communicative

26

research because she seeks to interview individuals with the intent of writing a dissertation that will "develop or contribute to generalizable knowledge."

167. Pursuant to their custom or policy, the IRB Defendants applied an unconstitutional licensing scheme and an unlawful prior restraint to Plaintiff's speech by prohibiting Plaintiff from conducting her communicative research for her already-approved dissertation proposal, chilling Plaintiff's speech.

168. Pursuant to their custom or policy, the IRB Defendants unconstitutionally established and exercised unconstrained and unmoored discretion in rejecting Ms. Issak's IRB application.

169. Pursuant to their custom or policy, IRB Defendants unconstitutionally conditioned Plaintiff's ability to complete her already-approved dissertation proposal on IRB approval of her proposed communicative research.

170. Pursuant to their custom or policy, IRB Defendants unconstitutionally applied a content-based regulation to Plaintiff's speech by requiring her to obtain IRB approval for her communicative research because Plaintiff intended to produce "generalizable" knowledge; such approval would not be required if Plaintiff sought to speak about "non-generalizable" knowledge.

171. Pursuant to their custom or policy, IRB Defendants unconstitutionally applied a speaker-based regulation to Plaintiff's speech: Ms. Issak, a social scientist communicating about generalizable knowledge, must obtain IRB approval, while researchers who do not seek to speak about generalizable knowledge need not obtain IRB approval.

172. Pursuant to their custom or policy, IRB Defendants unconstitutionally applied a viewpoint-based regulation to Plaintiff's speech by requiring Plaintiff to establish her proposed communicative research is "culturally appropriate."

173.    IRB Defendants lack a compelling governmental interest in requiring IRB approval for Plaintiff's communicative research or in requiring Plaintiff to establish her research was "culturally appropriate."

174.    Plaintiff seeks prospective relief in the form of a declaratory judgment holding the IRB Defendants may not require Ms. Issak to obtain approval of her dissertation and entry of a permanent injunction[19] barring the IRB Defendants from requiring Plaintiff to obtain approval from the IRB to complete her communicative research.

### FOURTH CLAIM FOR RELIEF

**42 U.S.C. § 1983: Abridgement of Plaintiff's Right to Freedom of Speech**
**In Violation of First Amendment**
**Against Defendants Beebe, Wyatt, and Withrow in Their Individual Capacities**

175.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

176.    Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in the IRB's unconstitutional decision to require Ms. Issak to proceed through the IRB process and to obtain prior approval from the IRB of her proposed communicative research because Plaintiff seeks to interview individuals with the intent of writing a dissertation that will "develop or contribute to generalizable knowledge."

177.    Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in applying the IRB's unconstitutional licensing scheme and an unlawful prior restraint by prohibiting Plaintiff from conducting her communicative research for her already-approved dissertation proposal, chilling Plaintiff's speech.

---

[19] Should the IRB Defendants' continued violation of Plaintiff's First Amendment rights prevent her from completing her dissertation within the eight-year time frame established by the University, Plaintiff will seek preliminary relief to avoid that irreparable harm.

28

178.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in establishing and exercising unconstitutional, unconstrained, and unmoored discretion in rejecting Ms. Issak's IRB applications.

179.     It has long been clearly established that discretion awarded a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.") (quotations and citations omitted). Further, "[w]hile [p]rior restraints are not unconstitutional *per se* … [a]ny system of prior restraint … comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc*, 493 U.S. at 225 (quotations and citations omitted).

180.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in unconstitutionally conditioning Plaintiff's ability to complete her already-approved dissertation proposal on IRB approval of her proposed speech.

181.     It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911.

182.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in the IRB's unconstitutional content-based decision that Plaintiff must obtain IRB approval for her research because she intends to produce "generalizable" knowledge; such approval would not be required if she sought to speak about "non-generalizable" knowledge.

183.     It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

29

184. Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in the IRB's unconstitutional speaker-based decision that Plaintiff, as a social scientist communicating about generalizable knowledge, must obtain IRB approval; such approval is not required for speakers of non-generalizable knowledge.

185. It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

186. Defendants Beebe, Wyatt, and Withrow acted under color of state law and, upon information and belief, were personally involved in the IRB's unconstitutional viewpoint-based decision requiring Plaintiff to establish her proposed research is "culturally appropriate."

187. It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (quoting *Reed*, 576 U.S. at 180 (Kagan, J., concurring)).

188. Plaintiff seeks nominal damages of $1 from each Individual Capacity Defendant for the above violations of her First Amendment rights.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor granting the following relief:

(i)     Declaratory judgment declaring that the University Defendants and IRB Defendants established an unconstitutional licensing scheme and prior restraint by prohibiting

Plaintiff from conducting her communicative research for her already-approved dissertation proposal absent IRB approval of her speech;

(ii)     Declaratory judgment declaring that the University Defendants granted and IRB Defendants exercised unconstitutionally unconstrained and unmoored discretion to approve or deny Plaintiff's speech;

(iii)    Declaratory judgment declaring that the University Defendants and IRB Defendants unconstitutionally conditioned Plaintiff's ability to complete her already-approved dissertation proposal on IRB approval of her proposed speech;

(iv)     Declaratory judgment declaring that the University Defendants and IRB Defendants unconstitutionally applied a content-based regulation to Plaintiff's speech by requiring her to obtain IRB approval for her communicative research because Plaintiff intends to write about "generalizable" knowledge in her dissertation;

(v)      Declaratory judgment declaring the University Defendants and IRB Defendants unconstitutionally applied a speaker-based regulation to Plaintiff's speech by requiring Plaintiff, as a social scientist communicating about generalizable knowledge, to obtain IRB approval;

(vi)     Declaratory judgment declaring the University Defendants and IRB Defendants unconstitutionally applied a viewpoint-based regulation to Plaintiff's speech by requiring Plaintiff to establish her proposed research is "culturally appropriate;"

(vii)    Permanent injunctive relief enjoining the University Defendants and IRB Defendants from maintaining the IRB mandate for Plaintiff's communicative research;

(viii)   Nominal damages from the Individual Capacity Defendants of $1 per Defendant;

(ix)     An award of attorneys' fees and costs to Plaintiff; and

(x)      Such other and further relief as the Court deems just and appropriate.

31

Dated: June 2, 2025

/S/Ben M. Rose
Ben M. Rose (TN Bar No. 21254)
RoseFirm, PLLC
Post Office Box 1108
Brentwood, Tennessee 37024
(615) 942-8295
ben@rosefirm.com

Kaitlyn D. Schiraldi (TN Bar No. 039737)*
Margot J. Cleveland (MI Bar No. P83564)**
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
Kaitlyn.Schiraldi@ncla.legal
Margot.Cleveland@ncla.legal

*Counsel for Plaintiff Idil Issak*
* Application for admission pending
**Application for admission *Pro Hac Vice*
forthcoming

32