# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT KNOXVILLE

_____

:

IDIL ISSAK,                                              :        Case No. 3:25-CV-00238-KAC-JEM

:

*Plaintiff*,                                             :

:

v.                                              :        **FIRST AMENDED COMPLAINT**

:

RANDY BOYD, PRESIDENT OF THE                            :
UNIVERSITY OF TENNESSEE SYSTEM,   :
in his Official Capacity;                               :
DONDE PLOWMAN, CHANCELLOR                                :
OF THE UNIVERSITY OF                                    :
TENNESSEE-KNOXVILLE,                                    :
in her Official Capacity;                               :
MARIEKE VAN PUYMBROECK,                                 :
VICE PROVOST AND DEAN OF                                :
THE GRADUATE SCHOOL,                                    :
in her Official Capacity;                               :
DEBORAH CRAWFORD,                                       :
VICE CHANCELLOR FOR                                     :
RESEARCH, INNOVATION &                                  :
ECONOMIC DEVELOPMENT,                                   :
in her Official Capacity;                               :
BRAD DAY, INTERIM ASSOCIATE                             :
VICE CHANCELLOR FOR THE                                 :
RESPONSIBLE CONDUCT OF                                  :
RESEARCH,                                               :
in his Official Capacity;                               :
GRACIELA S. CABANA DIRECTOR OF                          :
GRADUATE STUDIES,                                       :
in her Official Capacity                                :
PATRICK GRZANKA OF THE                                  :
COLLEGE OF ARTS AND SCIENCES,                           :
in his Individual and Official Capacities;              :
MICHAEL BLUM OF THE COLLEGE                             :
OF ARTS AND SCIENCES, in his                            :
Individual and Official Capacities;                     :
BARBARA HEATH OF THE                                    :
DEPARTMENT OF                                           :
ANTHROPOLOGICAL                                         :
ARCHAEOLOGY,                                            :
in her Individual and Official Capacities;              :

INSTITUTIONAL REVIEW BOARD;                    :
LORA BEEBE, CHAIR OF THE                       :
INSTITUTIONAL REVIEW BOARD,                    :
in her Individual and Official Capacities;     :
ROBERT WITHROW, ALTERNATIVE                    :
MEMBER OF                                      :
INSTITUTIONAL REVIEW                           :
BOARD AND DIRECTOR OF HUMAN                    :
RESEARCH PROTECTION PROGRAM,                   :
in his Individual and Official Capacities;     :
TAMI WYATT, INTERIM                            :
INSTITUTIONAL OFFICIAL OF                      :
INSTITUTIONAL REVIEW BOARD,                    :
in her Individual and Official Capacities;     :
                                               :
                            *Defendants.*      :
_____:

Plaintiff Idil Issak, a PhD student at the University of Tennessee-Knoxville, seeks declaratory relief, injunctive relief, and nominal damages to halt and redress Defendants' violations of her First Amendment right to freedom of speech.

## INTRODUCTION

1. This case is an as-applied challenge against employees and/or agents of the University of Tennessee in their individual and/or official capacities, the Institutional Review Board ("IRB") operating out of the University of Tennessee, and employees and/or agents of the IRB in their individual and/or official capacities, alleging Defendants abridged Plaintiff's First Amendment right to freedom of speech.

2. Defendants require social science researchers who seek to engage in research that involves communications with third parties to obtain permission from the IRB **before** conducting the oral and/or written interviews that form the basis of their research, if the research seeks to contribute to generalizable knowledge, and then to complete any research consistent with the IRB application and any terms or conditions of IRB approval.

2

3.      For modifications to be made to research proposals, the IRB must review and approve the changes. *See* IRB Standard Operating Procedures ("*SOPs*") 86[1] ("Investigators may wish to modify or amend approved research. Investigators must obtain IRB approval before making any changes, no matter how minor, in approved research unless the change is necessary to eliminate an apparent immediate hazard to the subject (in which case the IRB must then be notified at once)."); *id.* ("The modifications may not be implemented until the IRB has reviewed and approved the proposed changes.").

4.      Hereinafter, the requirement that researchers obtain IRB approval and then complete their proposed research consistent with the application and any terms or conditions of approval will be referred to as the "IRB Mandate."

5.      Additionally, the IRB Mandate requires communicative research conducted internationally to be "culturally appropriate" in the foreign country.

6.      Defendants apply and enforce the IRB Mandate even though the University's Doctoral Committee previously approved Plaintiff's dissertation research, concluding Ms. Issak's proposed communicative research satisfied all academic requirements for her PhD program.

7.      Thus, the IRB Mandate establishes an unconstitutional licensing scheme that operates as a prior restraint on speech.

8.      The IRB Mandate also constitutes an unconstitutional content-based, speaker-based and viewpoint-based restriction on speech and chills Ms. Issak's speech.

9.      Additionally, the IRB lacks clear standards for determining whether researchers seeking to conduct communicative research must comply with the IRB Mandate. The IRB also lacks

---

[1]     *SOPs*, Research Integrity & Assurance, U. OF TENN., (Feb. 1, 2025) https://research.utk.edu/research-integrity/human-research-protection-program/for-researchers/.

clear standards to guide the review process, with the IRB possessing unconstrained discretion to approve or reject an applicant's proposed communicative research.

10.     IRB members also lack the necessary knowledge and expertise to evaluate proposed interview questions or surveys or to judge the importance of the research.

11.     In short, the IRB Mandate in this case violates almost the full range of free speech doctrines, making it a First Amendment nightmare.

12.     Accordingly, the Court should declare the IRB Mandate unconstitutional, enjoin the IRB and the Official-Capacity Defendants from enforcing the IRB Mandate,[2] and award Ms. Issak $1 in nominal damages from each Individual-Capacity Defendant.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.[3]

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendant IRB maintains its principal place of business in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

15.     Plaintiff Idil Issak is a natural person and a resident of Knoxville, Tennessee who is temporarily living in New York City.

16.     Defendant Randy Boyd, President of the University of Tennessee System, is sued in his official capacity. As the President, Mr. Boyd holds executive management and administrative

---

[2] Ms. Issak's challenge is limited to the application of the IRB Mandate to social science research, where the research involves solely communicative research. Plaintiff does not challenge the IRB Mandate to the extent it applies to federally funded research or medical research.

[3] The First Amendment is made applicable to the States through the Fourteenth Amendment. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996).

authority over all parts of the University, which, upon information and belief, includes responsibility and authority for the IRB Mandate challenged herein.

17. Defendant Donde Plowman, Chancellor of the University of Tennessee-Knoxville, is sued in her official capacity. As the Chancellor, Ms. Plowman holds responsibility for the administration and management of the campus, which, upon information and belief, includes responsibility and authority for the IRB Mandate challenged herein.

18. Defendant Marieke Van Puymbroeck, Vice Provost and Dean of the Graduate School, is sued in her official capacity. Ms. Puymbroeck is directly involved in approving theses and dissertations, which, upon information and belief, involves implementing the IRB Mandate challenged herein.

19. Defendant Deborah Crawford, Vice Chancellor for Research, Innovation and Economic Development, is sued in her official capacity. Ms. Crawford oversees all research at the University of Tennessee-Knoxville, which, upon information and belief, involves implementing the IRB Mandate challenged herein.

20. Defendant Brad Day, Associate Vice Chancellor for the Responsible Conduct of Research, is sued in his official capacity. Mr. Day is directly responsible for directing students through the IRB process and, upon information and belief, ensuring that they adhere to the IRB Mandate challenged herein.

21. Defendant Graciela S. Cabana, Director of Graduate Studies for the Department of Anthropology, is sued in her official capacity. Dr. Cabana is directly responsible for directing students through the graduate program and, upon information and belief, ensuring graduate students adhere to the IRB Mandate challenged herein.

5

22.     Defendant Patrick Grzanka,[4] College of Arts and Sciences Divisional Dean for Social Sciences, is sued in both his individual and official capacities. Mr. Grzanka is responsible for maintaining an environment that enables research, which involves implementing the IRB Mandate challenged herein.

23.     Defendant Michael Blum, College of Arts and Sciences Associate Dean for Research and Creative Activity, is sued in both his individual and official capacities. Mr. Blum helps researchers meet compliance requirements before submitting research proposals, including, upon information and belief, directing compliance with the IRB Mandate challenged herein.

24.     Defendant Barbara Heath,[5] Department Head of Anthropological Archaeology, is sued in both her individual and official capacities. Ms. Heath is directly involved with overseeing the structure of PhD Doctoral Committees, shepherding students through the IRB process and, upon information and belief, implementing the IRB Mandate challenged herein.

25.     Defendant Institutional Review Board ("IRB") is, upon information and belief, an entity operating at the University, independent of University control.

26.     Defendant Dr. Lora Beebe, Chair of the IRB, is sued in both her individual and official capacities. As a member of the IRB, Ms. Beebe is directly involved in implementing the IRB Mandate challenged herein.

27.     Defendant Robert Withrow, alternate member of the IRB and Director of Human Research Protection Program, is sued in both his individual and official capacities. As a member of the IRB, Mr. Withrow is directly involved in implementing the IRB Mandate challenged herein.

---

[4] Upon information and belief, Defendant Grzanka has left, or is soon to be leaving, the University's employ, in which case the individual who replaces him should be substituted for Grzanka for purposes of the official-capacity claim. For clarity, the Amended Complaint will continue to refer to the official-capacity claim as against Defendant Grzanka.
[5] Defendants Boyd, Plowman, Puymbroeck, Crawford, Day, Cabana, Grzanka, Blum, and Heath, in their official capacities, are referred to jointly as "University Official-Capacity Defendants."

6

28. Defendant Tami Wyatt, Interim Institutional Official of the IRB, is sued in both her individual and official capacities.[6] As a member of the IRB, Ms. Wyatt is directly involved in implementing the IRB Mandate challenged herein.

29. Upon information and belief, Defendants all reside and/or work in Knoxville, Tennessee.

## STATEMENT OF FACTS

### A.    Plaintiff Idil Issak's Background

30. Plaintiff Idil Issak was born in Somalia but relocated to the United States in 1994 and is a United States citizen.

31. During her first year of college, Ms. Issak attended American University in Dubai, located in the United Arab Emirates ("UAE").

32. After her first year of college, Ms. Issak returned to the United States; she then obtained a Bachelor's Degree in Journalism from the University of Memphis, and a second Bachelor's Degree in Anthropology from the University of Tennessee-Knoxville.

33. Upon graduation, Ms. Issak returned to the UAE on a work visa where she witnessed foreign female domestic workers suffering human rights abuses.

34. This injustice motivated Ms. Issak to enter the PhD program at the University of Tennessee so she could research, understand, and write about the mental and physical burdens carried by enslaved and/or abused foreign female domestic workers in the UAE.

35. Currently, Plaintiff is entering her eighth year of a PhD program in Cultural Anthropology at the University of Tennessee.

---

[6] Defendants Beebe, Withrow, and Wyatt, in their official capacities, are referred to jointly as "IRB Official-Capacity Defendants."

36.     Ms. Issak's proposed PhD dissertation was originally titled *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to Exploitation in the UAE*. Her research seeks to focus on the plight of domestic workers in two of the seven United Emirates—Sharjah and Ajman.[7]

**B.      The University Approved Ms. Issak for PhD Admission to Candidacy**

37.     Obtaining a PhD at the University of Tennessee may take as many as eight years and costs approximately $320,000 for an in-state resident and approximately $464,000 for an out-of-state resident.

38.     PhD candidates must take 48 credit hours of coursework, and 24 credit hours related to their dissertation.

39.     Non-course requirements include annual performance reviews, comprehensive written exams with oral defense components, submission of a formal dissertation proposal, and an oral presentation and oral defense of the candidate's dissertation.

40.     Before a student can apply for "Admission to Candidacy," a prospective PhD candidate must: a) complete course work and satisfy GPA requirements; b) take and pass the Comprehensive Examination; c) establish a Doctoral Committee; and d) meet the residency requirement. Only after satisfying those conditions may a student defend his or her dissertation.

41.     The Comprehensive Examination has both a written and oral component.

42.     The written portion of the exam must be completed within seven days from when the student begins the exam.

43.     Students must complete the oral portion of the exam within two months after completion of the written portion.

---

[7]Ms. Issak's research is now titled *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to Working Conditions in the UAE.*

44.     Plaintiff completed both portions of the Comprehensive Examination by June 28, 2024.

45.     A Doctoral Committee must also approve a student's dissertation proposal within one semester of the student's completion of his or her Comprehensive Examination.

46.     The dissertation proposal includes the framework, background, questions to be answered and method of research for the PhD student's planned dissertation.

47.     The entire Doctoral Committee must approve the PhD student's dissertation proposal.

48.     Plaintiff's then-advisor, Dr. Raja Swamy, approved Ms. Issak's dissertation proposal on November 13, 2023.[8]

49.     On November 13, 2023, the Doctoral Committee also approved Ms. Issak's dissertation proposal.

50.     The members Ms. Issak selected for her Doctoral Committee consist of researchers with expertise in the subject matter of Plaintiff's dissertation.

51.     Dr. Tamar Shirinian was originally part of Ms. Issak's Doctoral Committee and has a background in trauma research, which aligned with Plaintiff's dissertation goal of understanding the trauma Ethiopian domestic workers have undergone.[9]

52.     Dr. Asafa Jalata is part of the Doctoral Committee and is a leading scholar on Ethiopia. Additionally, his work as a sociologist aligns with the goals of anthropological research.

---

[8] Ms. Issak did not select Dr. Swamy as her advisor; rather, after Ms. Issak's original advisor left the University, Dr. Swamy, as the sole tenure-track cultural anthropology professor remaining at the University, by default, became both Ms. Issak's advisor and the Chair of her Doctoral Committee.
[9] Dr. Tamar Shirinian, who is married to Dr. Swamy, is also no longer a member of Ms. Issak's Doctoral Committee.

9

53.    Dr. Kristin Monroe is part of the Doctoral Committee and is an Associate Professor of Anthropology at the University of Kentucky. Her expertise lies in doing research in the Middle East with vulnerable populations, which aligns with Plaintiff's dissertation goals.

54.    Ms. Issak successfully defended her dissertation proposal on November 13, 2023.

55.    Ms. Issak submitted her first application to the IRB on or about February 29, 2024.

56.    On April 29, 2025, the University officially admitted Ms. Issak to PhD candidacy, establishing the Summer of 2026 for the conferral of her degree.

57.    To obtain her degree, Ms. Issak must first complete and defend the dissertation the Doctoral Committee approved.

58.    Plaintiff, however, is prevented from conducting the necessary communicative research for her dissertation because the Defendants continue to require Ms. Issak to comply with the unlawful IRB Mandate, and the IRB and IRB Official-Capacity Defendants have not approved her research.

## C.    The Institutional Review Board Is Not an Arm of the State

59.    The Institutional Review Board is not an "arm of the State" shielded by sovereign immunity.

60.    There are several factors to consider when determining if an entity is an arm of the state. *See Laborers' Int'l Union of N. Am., Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022) (sovereign "immunity applies only to lawsuits against the State or 'an arm of the state[]'") (citations omitted). The Supreme Court considers: "(1) the State's potential liability for a judgment against the entity, … ; (2) the language by which state statutes, … and state courts, … refer to the entity and the degree of state control and veto power over the entity's actions, … ; (3) whether state or local officials appoint the board members of the entity, … ; and (4) whether the entity's functions fall within the traditional

10

purview of state or local government[.]" *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–45, 51 (1994)).

61.     The Sixth Circuit's factors are similar: "'(1) whether the state would be responsible for a judgment against the entity in question; (2) how state law defines the entity; (3) what degree of control the state maintains over the entity; and (4) the source of the entity's funding.'" *Id.* (quoting *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 420 (6th Cir. 2004)).

62.     In a June 3, 2024, email, Defendant Wyatt, the Interim Institutional Official of the IRB, stated that the IRB "is an independent entity separate from the [Human Research Protection Program] of the University."

63.     Upon information and belief, the IRB is an entity operating at the University and a University official appoints IRB members, but the IRB is not subject to control by either the University or the State of Tennessee.

64.     Upon information and belief, the IRB functions independently from the University of Tennessee. *See SOPs, supra* 1, at 22 ("The IRB functions independently of, but in coordination with, other organizational committees and officials. The IRB, however, makes independent determinations whether to approve, require modification in, or disapprove research based on whether human subjects are adequately protected.").

65.     Upon information and belief, the State does not have any veto power over IRB's actions. *See SOPs, supra* 1, at 9 ("[N]o one at The University of Tennessee Knoxville shall approve the implementation of human subject research that has not been approved by the IRB nor may anyone override a decision of the IRB.").

66.     Upon information and belief, the IRB does not "carr[y] out a long-recognized state function" since licensing of speech is unconstitutional. *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 764 (6th Cir. 2010). *See Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (a restriction that "makes the

11

peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms").

67.     Further, IRB's functions do not fall within the traditional purview of state or local government, with the IRB functioning primarily to comply with federal regulations particularly related to federally funded research.[10]

68.     The IRB is thus a political subdivision to which the Eleventh Amendment does not extend.

## D.     The Institutional Review Board's Requirements for Social Science Research

69.     While the IRB functions primarily to comply with federal regulations, it "has the authority to approve, disapprove, monitor, and require modifications in all research activities that fall within its jurisdiction[.]"[11]

70.     The IRB has jurisdiction to oversee research that involves communicating with third parties where the communicative research involves a "systematic investigation" "designed to contribute to generalizable knowledge."[12]

---

[10] *What is the IRB?*, U. OF TENN.-KNOXVILLE: RSCH. INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/for-irb-members/ (last visited Aug. 12, 2025).
[11] *Id.*
[12] *Human Research Protection Program FAQs*, U. OF TENN.-KNOXVILLE: RSCH. INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/human-research-protection-program-faqs/ (last visited Aug. 12, 2025) (emphasis deleted).

12

71.     A systematic investigation is defined by the University as "[a]n activity that involves a prospective study plan that incorporates data collection, either quantitative or qualitative, and data analysis to answer a study question."[13]

72.     Generalizable knowledge is defined by the University as "[i]nvestigations … designed to draw general conclusions (i.e., knowledge gained from a study may be applied to populations outside of the specific study population), inform policy, or generalize findings."[14]

73.     However, not all communicative research requires IRB approval: The University provides examples of research that may fall outside the purview of the IRB, such as a biography or oral history "if the information being collected focuses directly on the specific individuals about whom the information is collected and not on generalizing the information or findings to other individuals."[15]

74.     The definition of "generalizable knowledge" is vague, leaving the IRB with largely unconstrained discretion to determine whether researchers must comply with the IRB Mandate.

75.     Upon information and belief, the IRB *initially* concluded that Plaintiff's proposed communicative research involved "systematic investigation" designed to contribute to "generalizable knowledge" and that her research was thus subject to the IRB Mandate.

76.     The Defendants require Plaintiff to comply with the IRB Mandate even though the Doctoral Committee—with expertise aligned with Plaintiff's dissertation topic—already approved Ms. Issak's dissertation proposal.

---

[13] *Do I Need IRB Review?*, U. OF TENN.-KNOXVILLE RSCH. INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/human-research-protection-program/for-researchers/before-you-begin-2/activities-requiring-irb-review/ (last visited Aug. 12, 2025).
[14] *Id.*
[15] *Id.*

77. To obtain IRB approval, researchers must submit to the IRB: a) a completed IRB application; b) recruitment and screening materials for the proposed research; c) informed consent documents; and d) data collection materials.

78. When a researcher seeks to interview individuals located outside the United States, the student must also obtain a letter stating whether the local government requires review and a memo of cultural appropriateness.

**E.  Ms. Issak's Interaction with the IRB**

79. Plaintiff submitted her first application to the IRB on or about February 29, 2024, and has amended and re-submitted her application to the IRB more than six times, including on or about June 3, 2024, and on or about July 1, 2025, and has yet to obtain IRB approval.

80. Ms. Issak initially sought expedited review from the IRB, but the IRB denied her request for expedited review.

81. Upon information and belief, the individual or individuals who reviewed Plaintiff's application for expedited review lacked a scholarly expertise related to subject matter of Plaintiff's proposed research despite the fact that the University's IRB Standard Operating Procedures provide that "[d]esignated reviewers must be professionally competent (i.e., experienced with and having demonstrated the ability to apply IRB review requirements and with *appropriate scientific or scholarly expertise*) to conduct expedited reviews." *SOPs*, *supra* 1, at 63 (emphasis added).

82. Upon information and belief, the IRB also did not have a cultural anthropologist review Ms. Issak's proposed communicative research before seeking clarifying and/or additional information, even though the SOP provides that "[w]hen the IRB is presented with a research study which may be outside of the knowledge base or representative capacity of the IRB members, an outside consultant will be sought … . Research studies for which appropriate expertise cannot be

14

obtained for a given meeting will be deferred to another meeting when appropriate expertise is available." *Id.* at 64.

83. Upon information and belief, none of the IRB members who reviewed Ms. Issak's proposed research had knowledge of the relevant laws of the UAE.

84. The IRB later refused to consider Ms. Issak's application because it wrongly believed she needed approval from the UAE to conduct research in the UAE.

85. Specifically, the May 17, 2024 IRB decision letter, signed by Defendant Beebe, stated: "Pursuant to the DOH [Department of Health] Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained."

86. Plaintiff responded to IRB Chair Dr. Beebe by explaining that the DOH Standard only applies to the Abu Dhabi emirate and that because she was only conducting her proposed communicative research in two different emirates, namely Sharjah and Ajman, approval by an Ethics Committee in the UAE was not required.[16]

87. Ms. Issak and Defendant Beebe then exchanged several additional emails, with Dr. Beebe providing links purporting to support her claim UAE approval was required and with Ms. Issak explaining that one link provided applied only to a specific university in UAE and that the other links provided did not apply to Sharjah and Ajman—the emirates where Ms. Issak intended to conduct her communicative research.

88. In a May 21, 2024 email, Defendant Beebe responded that she "appreciated knowing that" and that she was "attending a conference this week and will reply in more detail later."

---

[16] The UAE is a country in the Middle East comprised of seven emirates, each of which has unique laws.

15

89. Defendant Beebe's May 21, 2024 email added that Defendant Withrow and Defendant Wyatt "are aware of your submission," with Beebe also adding both Withrow and Wyatt to the email thread.

90. Upon Bebee's return, Ms. Issak sent a follow-up email seeking clarity on the IRB's position, with Ms. Issak including both Defendants Withrow and Wyatt in her email response.

91. After multiple email exchanges, Ms. Issak wrote Defendants Bebee, Withrow and Wyatt again on May 29, 2024, stating: "[Y]ou and the committee are mistaken. . . [T]here are no laws in the UAE at the national level that requires a research ethics review for the social science research I am doing." Ms. Issak then asked for clarity on what precisely the IRB required to consider her application.

92. The IRB informed Plaintiff in a May 31, 2024 letter that "[i]n order to be placed on the full board agenda, all provisos within said outcome letter must be addressed and submitted by the required deadline of June 3, 2024. This includes proviso 1, which states, 'Pursuant to the DOH Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained.'"

93. The IRB's May 31, 2024 decision letter added: "As the student investigator has indicated the emirates in which research will be conducted do not require Ethics Committee approval, the IRB requires that the Memo of Cultural Appropriateness be revised to clearly state the emirates for which the signer has cultural and regulatory knowledge and whether or not those emirates require Ethics Committee approval to conduct the research procedures as described in the protocol."

94. The IRB refused to consider Plaintiff's application without this memorandum even though the DOH Standard expressly stated its purpose is "[t]o define the regulatory requirements for the conduct of clinical research involving human subjects in the Emirate of Abu Dhabi," and even though Plaintiff's proposed research did not involve individuals in the Emirate of Abu Dhabi.

16

95.     On June 3, 2024, Ms. Issak provided the IRB a letter confirming the DOH Standard does not apply to her research because she is not conducting research in Abu Dhabi: That letter stated "[w]hile there are Emirate-level regulations that apply to human-subjects research in Abu Dhabi, the same do not apply to research in Sharjah or Ajman."

96.     On June 3, 2024, Defendant Wyatt also emailed Ms. Issak, accusing her of lacking professionalism in communicating with Defendant Beebe: Defendant Wyatt, also informed Ms. Issak, that she had "asked the IRB Chair, IRB board members, and HRPP staff to keep [her] apprised of future communications received from [Ms. Issak] to monitor this situation."

97.     On June 17, 2024, the IRB, in a letter signed by Defendant Bebee, again rejected Plaintiff's IRB Application, directing Plaintiff to provide even more details concerning her planned communicative research, as well as demanding Ms. Issak explain how she intends to conduct a "comprehensive analysis" of the data.

98.     The IRB later transmitted a further decision letter, dated August 2, 2024, and signed by Defendant Withrow on behalf of the IRB, stating, among other things: "Your application currently does not show that the project meets the definition for human subjects research as a systematic investigation designed to contribute to generalizable knowledge."

99.     The IRB's August 2, 2024 letter represents the first time any Defendant indicated that Ms. Issak's research might not qualify as research subject to the IRB's jurisdiction.

100.    And even though the IRB's "authority to approve, disapprove, monitor, and require modifications in all research activities" is limited to activities that "fall within its jurisdiction," and although the IRB jurisdiction is limited to research that involves a "systematic investigation" "designed to contribute to generalizable knowledge," the IRB in its August 2, 2024 letter did not disclaim jurisdiction over Plaintiff's research; to the contrary, the IRB's letter instructed Plaintiff to further

17

revise her application, leading Ms. Issak to reasonably fear that if she begins her communicative research without IRB approval, she would be subject to discipline and jeopardize her PhD.

101.    Following her June 2024 submission, Ms. Issak was told that rather than submit her application through the computer system to the IRB, as she had done numerous times, that she must submit it to Dr. Swamy, and that afterwards it would be sent to the Department Head Heath, Arts and Science Divisional Dean Grzanka, and Associate Dean for Research Blum, and then to Withrow, and finally the IRB committee.

102.    Upon information and belief, the decision to alter the process for obtaining IRB approval was reached after Defendants Blum and Grzanka met with Defendants Beebe and Withrow, and later Defendant Heath. Ms. Issak was never allowed to attend those internal meetings.

103.    In a meeting Ms. Issak was unable to attend, on or about October 9, 2024, Defendant Heath spoke about the "new IRB process" for Dr. Swamy's advisees to obtain IRB approval, telling students that they were not allowed to directly contact the IRB and that instead they must submit their IRB applications to Dr. Swamy, and from there, the application would be routed to the Department Head (Heath), the Arts and Science Divisional Dean (Grzanka), and Associate Research Dean (Blum), and then to Withrow, and finally the IRB committee.

104.    In February 2025, Ms. Issak called Dr. Swamy and informed him that she was considering suing the IRB and had spoken with a legal organization about legal representation. Dr. Swamy told Ms. Issak if she sued the IRB or the University, he could no longer be her advisor.

105.    During this call, Dr. Swamy told Ms. Issak, words to the effect, that she needed to decide between pursuing her PhD or a lawsuit, and she couldn't pursue both.

106.    Dr. Swamy spent approximately an hour yelling at Ms. Issak, telling her she couldn't beat University of Tennessee lawyers, and he then gave her an ultimatum, telling her to call him back when she decided whether she intended to pursue her lawsuit.

107. Ms. Issak never answered Dr. Swamy's ultimatum and instead continued communicating with him via email or text about her IRB application and other academic topics. The discussion was never raised again.

108. However, soon after Ms. Issak filed suit on June 2, 2025, and served the University and the original Official Capacity Defendants, Dr. Swamy began demanding that she make extensive changes to her IRB application.

109. On June 24, 2025, Ms. Issak responded to Dr. Swamy's request for changes to her IRB Application, confirming that she had "addresse[d] all official provisos from the IRB and [met] the key federal criteria[17] for ethical approval, which are focused on minimized risk, informed consent, and participant privacy. The application is ready for formal consideration by the board." Ms. Issak's June 24, 2025 email further addressed Dr. Swamy's purported concerns.

110. Dr. Swamy responded on June 25, 2025 that he would review her "document and get back [to her]," adding: "I will send it on to the Deans for review. They will decide if it is ready to move forward to the IRB for submission, given the need to ensure it does not get returned to you for another round of revisions."

111. Dr. Swamy and Ms. Issak then exchanged several emails discussing their respective views on her IRB Application.

112. Then, on or about June 26, 2025, Dr. Swamy emailed Ms. Issak, claiming she was not adequately deferring to his recommendations, suggesting that she consider alternatives to completing her doctoral degree, and indicating that he would not continue as her advisor if she did not acquiesce to his direction. Dr. Swamy copied Defendants Cabana, Grzanka, and Blum on the email, stating that "[c]onsidering the extremely difficult process we have been going through to get your IRB application

---

[17] Federal regulations do not apply to Ms. Issak's research, but she nonetheless sought to meet or exceed federal standards.

19

completed, I am starting to have serious doubts whether you will be able to conduct research, ... ." Dr. Swamy then accused Ms. Issak of taking a hostile tone and being unwilling "to work with" his recommendations.

113. Given Dr. Swamy's prior ultimatum and his suggestion that Ms. Issak would not be able to complete her degree, Ms. Issak decided to seek out a new advisor.

114. However, because Ms. Issak believed she had addressed the IRB's concerns and desired to begin her research, and to expedite the IRB's review of her latest application, she submitted her revised application to the IRB on July 1, 2025, which was the deadline for consideration by the IRB in July.

115. Ms. Issak informed Dr. Cabana of these facts in a July 1, 2025 email, adding that she "believe[d] at this point that the best way forward for me to complete my PhD on time is for me to obtain a new advisor."

116. On July 1, 2025, Dr. Swamy replied to Ms. Issak's email, stating: "I had explicitly asked that you do not submit anything to the portal without formal approval. You still had not addressed the repeated requests to revise your application at numerous places. You nevertheless went ahead and did so. Since I am the [Principal Investigator] on this project, I will notify the IRB that this submission was made without my approval."

117. Dr. Swamy's email concluded: "If you feel you should be able to submit this application, you will need to address the changes required of you. Contact Dr. Cabana and me at the earliest if you would like to work towards resolving this situation."

118. The IRB rejected Ms. Issak's application because Dr. Swamy had not signed off on Plaintiff's proposed research.

119. Thereafter, Ms. Issak reached out to three other faculty members, with Dr. Pendry and Dr. Clemons agreeing to serve as advisors and new co-chairs on Ms. Issak's Doctoral Committee and

20

Dr. Christian agreeing to serve on Ms. Issak's Doctoral Committee, replacing Drs. Swamy and Shirinian. The University approved Ms. Issak's request to change her advisors.

120.     Upon information and belief, the IRB, as a body, has yet to review Ms. Issak's July 2025 application.

121.     The IRB, as a body, only reviews applications once per month, so every time individual members of the IRB request clarification or additional information, it delays consideration by the full board and in turn Plaintiff's research and her ability to graduate.

**F.     But for Defendants' Abridgement of Plaintiff's Free Speech Rights, Ms. Issak Could Begin Her Dissertation Research**

122.     Although the Doctoral Committee has approved Ms. Issak's dissertation proposal, she cannot begin her research until the IRB approves her application, and even after the IRB approves her application, the IRB Mandate continues to control Ms. Issak's speech.

123.     Conducting research in violation of the IRB Mandate can result in "[being] subject to non-compliance and research misconduct reporting to university officials."[18]

124.     Compliance with the IRB Mandate is necessary for the successful completion of a PhD program because students cannot complete their PhD program until they pass a final oral examination, and they cannot take that examination until they write their dissertations, but they cannot begin their research for the dissertation until the IRB approves their application.

125.     PhD candidates must complete the program within eight years of enrollment. Ms. Issak is currently entering her eighth year and still awaits approval by the IRB.

126.     The IRB Mandate has prevented Plaintiff from engaging in communicative research and has delayed Plaintiff's ability to complete her research, thereby increasing her educational expenses and putting at risk her ability to timely complete the PhD program.

---

[18] *Human Research Protection Program FAQs, supra* n.12.

## G. The IRB Regulates Fully Protected Speech, Not Conduct

127. Ms. Issak's efforts to develop and contribute to generalizable knowledge not only trigger coverage under the IRB Mandate, but also, in and of itself, constitute speech within the meaning of the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment.").

128. In her dissertation, Ms. Issak hopes to gather data through verbal communication that allows her to evaluate the adversities—mental and physical—faced by domestic workers in the UAE, grouping the women qualitatively by common experiences.

129. Plaintiff's research seeks to develop and contribute to generalizable knowledge by use of interviews and her written analyses of the interviews, and thus Plaintiff's research consists wholly of protected speech. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (explaining that "[t]he protection of the First Amendment is not limited to written or spoken words"); *see also Burson v. Freeman*, 504 U.S. 191, 207 (1992) (referring to "exit polling" as "other types of speech"); *Connick v. Myers*, 461 U.S. 138, 149–50 (1983) (characterizing a survey as "speech").

130. Further, the fact that Ms. Issak's "speech" consists of questions, is of no matter for "[q]uestions, no less than forcefully stated opinions and facts, carry messages." *See Connick*, 461 U.S. at 152.

131. Because Ms. Issak's speech seeks to "develop or contribute to generalizable knowledge," her research is subject to the IRB Mandate.

132. Upon information and belief, Defendants would not require Ms. Issak to obtain IRB approval if she intended to write an oral history summarizing her interviews and/or did not seek to contribute to generalizable knowledge.[19]

---

[19] *See Do I Need IRB Review?*, *supra* n.13.

133.    The Supreme Court has made clear that what "trigger[s] coverage," controls the determination of whether a regulation governs "speech" or "conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Thus, if the so-called "conduct" that "trigger[s]" coverage "consists of communicating a message," then the law regulates speech. *Id.*

134.    Because whether the IRB Mandate applies to Plaintiff's research rests on the content of her speech, namely whether her communication research seeks to "develop or contribute to generalizable knowledge," the IRB Mandate regulates speech and not conduct.

## H.    The IRB Mandate Is an Unconstitutional Licensing Requirement and Thus a Prior Restraint

135.    By requiring Ms. Issak to comply with the IRB Mandate prior to engaging in speech related to her PhD dissertation, the IRB Mandate establishes a licensing system and constitutes an unconstitutional prior restraint.

136.    Failure to comply with the IRB Mandate could subject Ms. Issak to discipline and put her PhD in jeopardy, as conducting research absent compliance with the IRB Mandate makes one "subject to non-compliance and research misconduct reporting to university officials."[20]

137.    Such authoritarian licensing of the "publication of literature" was practiced "[i]n Tudor England[,] [where] officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan[,]" however, it was thoroughly rejected in our Republic. *Stanford v. Texas*, 379 U.S. 476, 482 (1965).

138.    The act of licensing "is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733–34 (1931) (quotations and citations omitted).

---

[20] *Human Research Protection Program FAQs*, *supra* n.12.

139. Accordingly, the Founding generation ratified the First Amendment to protect against such licensing mandates.

140. The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut,* 310 U.S. 296, 305 (1940), by the licensing authority, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great" to be permitted, *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

141. Licensing, or prior review, of speech is additionally unconstitutional when it is discretionary, as "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotations and citations omitted).

142. A restriction that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

143. The IRB lacks narrow, objective, and definite standards to guide its review of applications and instead possesses unconstrained discretion to both determine whether the IRB Mandate applies and then to appraise facts, exercise judgment, and formulate opinions concerning whether to approve the proposed communicative research.

144. Specifically, the SOP provides that "[r]eviewing officials may strengthen requirements and/or conditions, or add other modifications before approval, or may require approval by an additional committee, office, or person." *SOPs, supra* 1, at 50.

145. In refusing to approve Ms. Issak's application, the IRB made numerous judgments that involved significant and unfettered discretion, such as determining the "importance of the

24

knowledge" to be gained and whether the "[r]isks to the subjects" from interviews "are reasonable in relation to anticipated benefits" flowing from the research.[21]

146.     Further, the IRB partially outsourced its discretion to approve communicative research to non-citizens by requiring applicants to obtain letters of "cultural appropriateness" from a local authority.

147.     "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

148.     By adopting, implementing, and enforcing the IRB Mandate, Defendants have already suppressed and chilled Ms. Issak's speech, prompting her to narrow the areas of her inquiry—Ms. Issak's most recent application to the IRB contains only 25% of the content she originally intended to research—and causing Ms. Issak to soften the title of her research from *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to* **Exploitation** *in the UAE* to *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to* **Working Conditions** *in the UAE*. (Emphases added).

149.     Upon information and belief, the IRB Mandate has also chilled some other graduate students' speech by prompting them to modify their proposed dissertations or causing them to opt for degrees that are not subject to the IRB Mandate.

---

[21] *Full Board Review*, UNIVERSITY OF TENNESSEE-KNOXVILLE RESEARCH INTEGRITY & ASSURANCE, https://research.utk.edu/research-integrity/full-board-review/#:~:text=Risks%20to%20subjects%20are%20minimized,for%20diagnostic%20or%20treatment%20purposes.

**I. The IRB Mandate Establishes an Unconstitutional Condition to Ms. Issak Obtaining Her PhD**

150.     For Ms. Issak to begin her dissertation research and graduate, she must succumb to the speech restraints dictated by the Defendants. In other words, Defendants have conditioned Ms. Issak's ability to obtain a PhD on her forfeiting her First Amendment rights.

151.     The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

152.     "The government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019).

**J. The IRB Mandate Constitutes a Content-Based Restriction on Speech Subject to Strict Scrutiny**

153.     The IRB Mandate creates a content-based regulation because whether research is subject to the IRB Mandate depends on the content of the speech.

154.     Specifically, the IRB Mandate distinguishes between communicative research designed to produce "generalizable" knowledge and research focused on "non-generalizable" knowledge, with the IRB Mandate applying to the former communicative research, but not the latter.

155.     Thus, "[s]cholarly and journalistic activities" such as "oral history, journalism, biography, literary criticism, legal research, and historical scholarship" generally do not require IRB approval because they purportedly do not produce "generalizable" knowledge.[22] *Cf.* 45 C.F.R. § 46.102(l)(1).

---

[22] *See Do I Need IRB Review?*, *supra* n.13.

156.    "Regulation of speech is content-based and therefore subject to strict scrutiny 'if a law applies to particular speech because of the topic discussed or the idea or message expressed'; some obvious facial distinctions based on a message include 'defining regulated speech by particular subject matter' or 'by its function or purpose.'" *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)).

157.    The Supreme Court in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), found a state tax content-based where the statute drew a distinction similar to the "generalizable"/"non-generalizable" knowledge distinction the IRB Mandate adopts.

158.    In *Ragland*, the Court held that a tax on "general interest" magazines, but not on religious, trade, professional, and sports ones, was content based. *Id.* at 223, 230. Put plainly, "a magazine's tax status depend[ed] entirely on its *content.*" *Id.* at 229.

159.    In that case, to determine whether the tax applied to a magazine, the "enforcement authorities [had to] necessarily examine the content of the message that [was] conveyed." *Id.* at 230 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

160.    Under *Ragland*, then, the IRB Mandate's distinction between "generalizable" and "non-generalizable" knowledge represents a content-based restriction on speech.

161.    "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

162.    Further, such content-based regulations are "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

163. "Only rarely are statutes sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 228 n.6 (1984).

**K.    The IRB Mandate Is a Speaker-Based Restriction of Speech Subject to Strict Scrutiny**

164. Not only does the IRB Mandate constitute a content-based regulation, but it is also a speaker-based regulation on speech.

165. The IRB Mandate imposes a speaker-based restriction similar to that at issue in *Ragland*—just as the tax scheme in that case treated "general interest" magazines "less favorably than others," 481 U.S. at 229, the IRB Mandate treats speakers addressing "generalizable knowledge" less favorably than others.

166. Specifically, the IRB Mandate treats speech by historians, journalists, and behavioral scientists differently, with historians and journalists generally not subject to the IRB Mandate because they do not intend to contribute to "generalizable knowledge." *Cf.* Letter from Michael A. Carome, Assoc. Dir. for Regul. Affairs, Off. for Hum. Rsch. Prots. to Linda Shopes and Donald Ritchie, Leaders of the Oral History Ass'n (Sept. 22, 2003)[23] ("Oral History Letter").

167. Even though historians conducting oral-history research systematically conduct interviews and "reach for meaning that goes beyond the specific subject of their inquiry," the government assumes that such historians, unlike researchers in the behavioral sciences, "do not reach for generalizable principles of historical or social development, nor do they seek underlying principles or laws of nature that have predictive value and can be applied to other circumstances for the purpose of controlling outcomes."[24] And thus the IRB Mandate does not generally apply to oral historians.

---

[23]https://research.unl.edu/orr/docs/OHRPResponsetoOralHistories.pdf
[24]*Id.*

168.     Conversely, the IRB Mandate applies to Plaintiff's communicative research because Ms. Issak seeks to qualitatively group participants to identify patterns, to delineate common themes, and then to speak about generalizable principles in her dissertation.

169.     Accordingly, because the IRB Mandate applies to Ms. Issak as a qualitative researcher, but does not apply to historians or journalists, the IRB Mandate constitutes a speaker-based regulation. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

170.     Upon information and belief, Defendants would not require historians and journalists who conduct equivalent communicative research to comply with the IRB Mandate if they do not seek to speak about generalizable principles.

171.     Given the inconsistencies and exceptions to the application of the IRB Mandate, the IRB Mandate in the social sciences lacks any congruence with a legitimate goal and thus cannot satisfy strict scrutiny. *See Reed*, 576 U.S. at 168–70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)) (holding "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference").

## L.     The IRB Mandate Establishes a Viewpoint-Based Regulation of Speech Subject to Strict Scrutiny

172.     Further, the IRB Mandate establishes a viewpoint-based regulation of speech by requiring researchers conducting research internationally to obtain a letter stating the research is deemed "culturally appropriate" in the country in which the research will take place, making third parties the arbiters of what communicative research is allowed based on the viewpoint of the research.

29

173.     Government discrimination among viewpoints—those targeting "particular views"—is a "more blatant" and "egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

174.     "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

175.     Further, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

176.     "Both content- and viewpoint-based discrimination are subject to strict scrutiny. … No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (internal citations omitted).

177.     The IRB Mandate's requirement that an applicant obtain a statement of the cultural appropriateness of the research, as a viewpoint-based restriction, is thus a further unconstitutional abridgment of speech. *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (explaining the very "purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals['] … ideas from suppression . . . at the hand of an intolerant society").

## M.     University Official-Capacity Defendants Hold Responsibility For, and Authority Over, the Adoption, Implementation, or Enforcement of the Unconstitutional IRB Mandate

178.     Each University Official-Capacity Defendant, by virtue of his or her position at the University and the responsibilities and authority of that position, caused the deprivation of Ms. Issak's First Amendment rights.

30

179.     A Section 1983 suit seeking prospective declaratory and injunctive relief against official-capacity defendants, need not allege "personal involvement" of the officials; rather, "[a] plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013). *See also Floyd v. Cnty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012) ("The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains.").

180.     Defendant Boyd, as President of the University of Tennessee System, holds executive management and administrative authority over all component parts of the University and as such, upon information and belief, holds responsibility and authority over the maintenance of, or enforcement of, the IRB Mandate challenged herein.

181.     Defendant Plowman, as Chancellor of the University of Tennessee, Knoxville, holds responsibility for the administration and management of the campus and, as such, upon information and belief, holds responsibility and authority over the maintenance of, or enforcement of, the IRB Mandate challenged herein.

182.     Defendant Van Puymbroeck, as Vice Provost and Dean of the Graduate School, holds responsibility for approving theses and dissertations and, as such, upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

183.     Defendant Crawford, Vice Chancellor for Research, holds direct responsibility for overseeing all research at the University of Tennessee-Knoxville and, as such, upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

31

184. Defendant Day, Associate Vice Chancellor for the Responsible Conduct of Research, holds direct responsibility for directing students through the IRB process and, as such, upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

185. Defendant Cabana, Director of Graduate Studies for the Department of Anthropology, holds direct responsibility for directing students through the graduate program and, as such, upon information and belief, holds responsibility and authority over graduate students to ensure they adhere to the IRB Mandate challenged herein.

186. Defendant Grzanka, Divisional Dean for Social Sciences in the College of Arts and Sciences, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein, for PhD candidates in the College of Arts and Sciences.

187. Defendant Blum, the Associate Dean for Research and Creative Activity in the College of Arts and Sciences, holds responsibility and authority over the enforcement and implementation of the IRB Mandate, challenged herein, for PhD candidates in the College of Arts and Sciences.

188. Defendant Heath, as Department Head of Anthropological Archaeology, holds responsibility and authority over the enforcement and implementation of the IRB Mandate, challenged herein, for PhD students in the Department of Anthropological Archaeology.

189. Upon information and belief, University Official-Capacity Defendants, individually or in combination, have allowed certain researchers to conduct communicative research without complying with the IRB Mandate.

32

**N.    IRB Official-Capacity Defendants Hold Responsibility For, and Authority Over, the Adoption, Implementation, or Enforcement of the Unconstitutional IRB Mandate**

190.    Each IRB Official-Capacity Defendant, by virtue of his or her position on the IRB and the responsibility and authority of that position, caused the deprivation of Ms. Issak's First Amendment rights.

191.    Defendant Beebe, as Chair of the IRB, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

192.    Defendant Withrow, as alternate member of the IRB and Director of Human Research Protection Program, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

193.    Defendant Wyatt, as Interim Institutional Official of the IRB, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

194.    Upon information and belief, IRB Official-Capacity Defendants, individually or in combination, have allowed certain researchers to conduct communicative research without complying with the IRB Mandate.

**O.    University Individual-Capacity Defendants Personally Caused the Deprivation of Ms. Issak's First Amendment Rights**

195.    Each University Individual-Capacity Defendant, acting under color of state law, personally caused the deprivation of Ms. Issak's First Amendment rights detailed above through their individual communications and interactions with Ms. Issak, by making clear that Ms. Issak must comply with the IRB Mandate to conduct her communicative research for her PhD dissertation.

196.    Section 1983 "imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020).

33

197. Personal involvement can exist in a variety of situations, including, among other things, where a state actor "implicitly authorized, approved, or knowingly acquiesced" in an alleged unconstitutional violation, *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citation omitted), where a defendant condoned the unconstitutional conduct, or "encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016).

198. Defendant Grzanka directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally coordinating with the other Defendants about Ms. Issak's IRB application and the procedures which Ms. Issak must use to comply with the IRB Mandate; upon information and belief, announcing at the October 9, 2024 meeting the new procedures Ms. Issak and other social science researchers must use to comply with the IRB Mandate; directly and personally coordinating with Dr. Swamy to implement the new procedures instituted to enforce the IRB Mandate against Ms. Issak; and directly and personally reviewing IRB applications for social science researchers to assess whether the IRB application complied with the IRB Mandate before routing it to the IRB.

199. Defendant Blum directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally coordinating with the other Defendants about Ms. Issak's IRB application and the procedures which Ms. Issak must use to comply with the IRB Mandate; upon information and belief, participating in the October 9, 2024 meeting announcing the new procedures Ms. Issak and other social science researchers must use to comply with the IRB Mandate; directly and personally coordinating with Dr. Swamy to implement the new procedures instituted to enforce the IRB Mandate against Ms. Issak; and directly and personally

34

reviewing IRB applications for social science researchers to assess whether the IRB application complied with the IRB Mandate before routing it to the IRB.

200. Defendant Heath directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally coordinating with the other Defendants about Ms. Issak's IRB application and the procedures which Ms. Issak must use to comply with the IRB Mandate; directing students to attend the October 9, 2024, meeting announcing the new procedures Ms. Issak and other social science researchers must use to comply with the IRB Mandate; and directly and personally reviewing IRB applications for social science researchers to assess whether the IRB application complied with the IRB Mandate before routing it to the IRB.

## P. IRB Individual-Capacity Defendants Personally Caused the Deprivation of Ms. Issak's First Amendment Rights

201. Each IRB Individual-Capacity Defendant, acting under color of state law, personally caused the deprivation of Ms. Issak's First Amendment rights detailed above by requiring Ms. Issak to comply with the IRB Mandate.

202. Defendant Beebe directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally applying the unconstitutional IRB Mandate to Ms. Issak, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed communicative research without subjecting herself to disciplinary action. Defendant Beebe signed five of Ms. Issak's outcome letters dated March 25, 2024, May 17, 2024, May 31, 2024, June 17, 2024, and July 29, 2024, preventing her from engaging in First Amendment protected speech.

35

203.    Defendant Withrow directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally applying the unconstitutional IRB Mandate to Ms. Issak, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed communicative research without subjecting herself to disciplinary action. Defendant Withrow signed one of Ms. Issak's outcome letters on August 2, 2024, preventing her from engaging in First Amendment protected speech, and was the analyst responsible for reviewing her applications.

204.    Defendant Wyatt directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights, by, among other things, directly and personally applying the IRB Mandate to Plaintiff, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed communicative research without subjecting herself to disciplinary action.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's 's Right to Freedom of Speech
### In Violation of the First Amendment
### Against University Official-Capacity Defendants

205.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

206.    The University's IRB Mandate establishes an unconstitutional licensing scheme and prior restraint on Ms. Issak's speech.

207.    The University's IRB Mandate unconstitutionally grants unfettered discretion to the IRB to grant, deny, or establish conditions on Ms. Issak's speech.

36

208. The University's IRB Mandate unconstitutionally chills Ms. Issak's speech.

209. The University's IRB Mandate unconstitutionally conditions Ms. Issak's ability to complete her already-approved dissertation proposal on Ms. Issak forfeiting her First Amendment rights.

210. The University's IRB Mandate represents an unconstitutional content-based regulation of speech: The IRB Mandate establishes a content-based regulation by applying to research seeking to advance "generalizable" knowledge but not to research concerning "non-generalizable" knowledge.

211. The University's IRB Mandate represents an unconstitutional speaker-based regulation of speech: The IRB Mandate establishes a speaker-based regulation by applying to social scientists communicating about generalizable knowledge but not to researchers, such as journalists and historians, who do not conduct research to advance generalizable knowledge.

212. The University's IRB Mandate represents an unconstitutional viewpoint-based regulation of speech because it requires Ms. Issak to establish her research is "culturally appropriate."

213. The University lacks a compelling governmental interest to justify the IRB Mandate as applied to Ms. Issak.

214. The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

215. The University Official-Capacity Defendants, acting under color of state law and by virtue of their offices, are each responsible for the adoption, implementation, oversight, and/or maintenance of, or enforcement of, the University's unconstitutional IRB Mandate.

216. Ms. Issak seeks prospective relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research which is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the

37

First Amendment, and entry of a permanent injunction barring the University Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's social science research.[25]

## SECOND CLAIM FOR RELIEF

**42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech**
**In Violation of the First Amendment**
**Against University Defendants Grzanka, Blum, and Heath**
**in Their Individual Capacities**

217.    Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

218.    Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which constitutes an unconstitutional licensing scheme and unlawful prior restraint on Ms. Issak's speech and which unconstitutionally chills Ms. Issak's speech.

219.    Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which provides the IRB unconstitutionally unconstrained and unmoored discretion.

220.    It has long been clearly established that discretion awarded a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.") (quotations and citations omitted). Further, "[w]hile [p]rior restraints are not unconstitutional per se … [a]ny system of prior restraint … comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc, v. City of Dallas*, 493 U.S. 215, 225 (1990) (quotations and citations omitted).

---

[25] Should University Official-Capacity Defendants' continued violation of Plaintiff's First Amendment rights prevent her from completing her dissertation within the eight-year time frame established by the University, Plaintiff will seek preliminary relief to avoid that irreparable harm.

221.    Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional condition, by preventing Ms. Issak from completing her already-approved dissertation proposal unless she forfeited her First Amendment rights.

222.    It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911.

223.    Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional content-based restriction based on Ms. Issak's intent to produce "generalizable" knowledge; the IRB Mandate does not apply to communicative research about "non-generalizable" knowledge.

224.    It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

225.    Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional speaker-based restriction on her speech because Ms. Issak is a social scientist communicating about generalizable knowledge; the IRB Mandate does not apply to historians or journalists speaking about non-generalizable knowledge.

226.    It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-

39

identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

227.     Defendants Grzanka, Blum, and Heath acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional viewpoint-based restriction that required Ms. Issak to establish her proposed research is "culturally appropriate," making Ms. Issak's ability to conduct communicative research subject to the viewpoint of her speech.

228.     It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (quoting *Reed*, 576 U.S. at 180 (Kagan, J., concurring)).

229.     Plaintiff seeks nominal damages of $1 from Defendants Grzanka, Blum, and Heath for the above violations of her First Amendment rights.

### THIRD CLAIM FOR RELIEF

**42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
In Violation of the First Amendment
Against IRB Official-Capacity Defendants**

230.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

231.     The IRB Mandate establishes an unconstitutional licensing scheme and prior restraint on Ms. Issak's speech.

232.     The IRB Mandate unconstitutionally grants unfettered discretion to the IRB to grant, deny, or establish conditions on Ms. Issak's speech.

233.     The IRB Mandate unconstitutionally chills Ms. Issak's speech.

40

234. The IRB Mandate unconstitutionally conditions Ms. Issak's ability to complete her already-approved dissertation proposal on Ms. Issak forfeiting her First Amendment rights.

235. The IRB Mandate represents an unconstitutional content-based regulation of speech: The IRB Mandate establishes a content-based regulation by applying to research seeking to advance "generalizable" knowledge but not to research concerning "non-generalizable" knowledge.

236. The IRB Mandate represents an unconstitutional speaker-based regulation of speech: The IRB Mandate establishes a speaker-based regulation by applying to social scientists communicating about generalizable knowledge but not to researchers, such as journalists and historians, who do not conduct research to advance generalizable knowledge.

237. The IRB Mandate represents an unconstitutional viewpoint-based regulation of speech because it requires Ms. Issak to establish her research is "culturally appropriate."

238. The IRB lacks a compelling governmental interest to justify the IRB Mandate, as applied to Ms. Issak.

239. The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

240. The IRB Official-Capacity Defendants, acting under color of state law and by virtue of their offices, are each responsible for the adoption, implementation, oversight, and/or maintenance of, or enforcement of, the unconstitutional IRB Mandate.

241. Ms. Issak seeks prospective relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research which is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the

41

First Amendment, and entry of a permanent injunction barring the IRB Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's social science research.[26]

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
### In Violation of the First Amendment
### Against IRB Defendants Beebe, Wyatt, and Withrow in Their Individual Capacities

242.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

243.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which constitutes an unconstitutional licensing scheme and unlawful prior restraint on Ms. Issak's speech and which unconstitutionally chills Ms. Issak's speech.

244.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which provides the IRB unconstitutionally unconstrained and unmoored discretion.

245.     It has long been clearly established that discretion awarded a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority.") (quotations and citations omitted). Further, "[w]hile [p]rior restraints are not unconstitutional per se … [a]ny system of prior restraint … comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc*, 493 U.S. at 225 (quotations and citations omitted).

---

[26] Should IRB Official-Capacity Defendants' continued violation of Plaintiff's First Amendment rights prevent her from completing her dissertation within the eight-year time frame established by the University, Plaintiff will seek preliminary relief to avoid that irreparable harm.

42

246. Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional condition, by preventing Ms. Issak from completing her already-approved dissertation proposal unless she forfeited her First Amendment rights.

247. It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911.

248. Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional content-based restriction based on Ms. Issak's intent to produce "generalizable" knowledge; the IRB Mandate does not apply to communicative research about "non-generalizable" knowledge.

249. It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

250. Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional speaker-based restriction on her speech because Ms. Issak is a social scientist communicating about generalizable knowledge; the IRB Mandate does not apply to historians or journalists speaking about non-generalizable knowledge.

251. It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-

43

identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

252.     Defendants Beebe, Wyatt, and Withrow acted under color of state law and personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional viewpoint-based restriction that required Ms. Issak to establish her proposed research is "culturally appropriate," making Ms. Issak's ability to conduct communicative research subject to the viewpoint of her speech.

253.     It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (quoting *Reed*, 576 U.S. at 180 (Kagan, J., concurring)).

254.     Plaintiff seeks nominal damages of $1 from Defendants Beebe, Wyatt, and Withrow for the above violations of her First Amendment rights.

**FIFTH CLAIM FOR RELIEF**

**42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
In Violation of the First Amendment
Against the IRB**

255.     Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

256.     The IRB, acting under color of state law, maintains a custom or policy that requires social science researchers who conduct communicative research to comply with the IRB Mandate if the researcher seeks "to develop or contribute to generalizable knowledge."

257.     The IRB, acting under color of state law, maintains a custom or policy that grants the IRB significant and unfettered discretion in applying the IRB Mandate.

44

258.    The IRB, acting under color of state law, maintains a custom or policy that requires social science researchers to obtain a letter stating that the interviews they intend to conduct internationally are "culturally appropriate" to comply with the IRB Mandate.

259.    Pursuant to its custom or policy, the IRB applied the IRB Mandate's unconstitutional licensing scheme and prior restraint to Ms. Issak's speech, violating Ms. Issak's First Amendment rights.

260.    Pursuant to its custom or policy, the IRB applied its significant and unfettered discretion to Ms. Issak's speech, chilling Ms. Issak's speech and violating Ms. Issak's First Amendment rights.

261.    Pursuant to its custom or policy, the IRB applied the IRB Mandate's unconstitutional condition to Ms. Issak, thereby preventing Ms. Issak from conducting the research her Doctoral Committee already approved for purposes of her PhD candidacy.

262.    Pursuant to its custom or policy, the IRB applied the IRB Mandate's unconstitutional content-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

263.    Pursuant to its custom or policy, the IRB applied the IRB Mandate's unconstitutional speaker-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

264.    Pursuant to its custom or policy, the IRB applied the IRB Mandate's unconstitutional viewpoint-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

265.    The IRB lacks a compelling governmental interest to justify the IRB Mandate as applied to Ms. Issak.

266.    The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

267.    Ms. Issak seeks prospective relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research which is not funded by the

45

federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment, and entry of a permanent injunction barring the IRB from applying the IRB Mandate to Ms. Issak's social science research.[27]

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor granting the following relief:

(i)     Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional licensing scheme and prior restraint;

(ii)     Declaratory judgment declaring that the IRB Mandate grants the IRB unconstitutional, unconstrained, and unmoored discretion;

(iii)     Declaratory judgment declaring that the IRB Mandate unconstitutionally chills Plaintiff's speech;

(iv)     Declaratory judgment declaring that the IRB Mandate unconstitutionally conditions Plaintiff's ability to complete her already-approved dissertation proposal on her forfeiting her First Amendment rights;

(v)     Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional content-based regulation of Plaintiff's speech by requiring her to comply with the IRB Mandate because she intends to write about "generalizable" knowledge in her dissertation;

---

[27] Should the IRB's continued violation of Plaintiff's First Amendment rights prevent her from completing her dissertation within the eight-year time frame established by the University, Plaintiff will seek preliminary relief to avoid that irreparable harm.

46

(vi)  Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional speaker-based regulation of Plaintiff's speech by requiring Plaintiff, as a social scientist communicating about generalizable knowledge, to obtain IRB approval;

(vii)  Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional viewpoint-based regulation of Plaintiff's speech by requiring Plaintiff to establish her proposed research is "culturally appropriate;"

(viii)  Declaratory judgment declaring that the IRB Mandate, when applied to Plaintiff's social science communicative research which is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment;

(ix)  Permanent injunctive relief enjoining the IRB, the University Official-Capacity Defendants, and the IRB Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's social science research that involves solely communicative research, where the research is not funded by the federal government;

(x)  Permanent injunctive relief enjoining the IRB, the University Official-Capacity Defendants, and the IRB Official-Capacity Defendants from requiring Ms. Issak to comply with the IRB Mandate;

(xi)  Nominal damages from the Individual Capacity Defendants of $1 per Defendant;

(xii)  An award of attorneys' fees and costs to Plaintiff; and

(xiii)  Such other and further relief as the Court deems just and appropriate.

Dated: August 13, 2025

/S/ *Margot J. Cleveland*

Kaitlyn D. Schiraldi (TN Bar No. 039737)
Margot J. Cleveland (MI Bar No. P83564)*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive

47

Suite 300
Arlington, VA 22203
(202) 869-5210
Kaitlyn.Schiraldi@ncla.legal
Margot.Cleveland@ncla.legal

*Counsel for Plaintiff Idil Issak*
*Admitted *Pro Hac Vice*

Ben M. Rose (TN Bar No. 21254)
RoseFirm, PLLC
Post Office Box 1108
Brentwood, Tennessee 37024
(615) 942-8295
ben@rosefirm.com

48