_____

|  |  |  |
|---|---|---|
| IDIL ISSAK, | : | |
| | : | Case No. 3:25-CV-00238-KAC-JEM |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | **SECOND AMENDED COMPLAINT** |
| | : | |
| RANDY BOYD, PRESIDENT OF THE | : | |
| UNIVERSITY OF TENNESSEE SYSTEM, | : | |
| in his Official Capacity; | : | |
| DONDE PLOWMAN, CHANCELLOR | : | |
| OF THE UNIVERSITY OF | : | |
| TENNESSEE-KNOXVILLE, | : | |
| in her Official Capacity; | : | |
| MARIEKE VAN PUYMBROECK, | : | |
| VICE PROVOST AND DEAN OF | : | |
| THE GRADUATE SCHOOL, | : | |
| in her Official Capacity; | : | |
| DEBORAH CRAWFORD, | : | |
| VICE CHANCELLOR FOR | : | |
| RESEARCH, INNOVATION & | : | |
| ECONOMIC DEVELOPMENT, | : | |
| in her Official Capacity; | : | |
| BRAD DAY, INTERIM ASSOCIATE | : | |
| VICE CHANCELLOR FOR THE | : | |
| RESPONSIBLE CONDUCT OF | : | |
| RESEARCH, | : | |
| in his Official Capacity; | : | |
| GRACIELA S. CABANA DIRECTOR OF | : | |
| GRADUATE STUDIES, | : | |
| in her Official Capacity; | : | |
| GINA OWENS OF THE | : | |
| COLLEGE OF ARTS AND SCIENCES, | : | |
| in her Official Capacity; | : | |
| MICHAEL BLUM OF THE COLLEGE | : | |
| OF ARTS AND SCIENCES, | : | |
| in his Individual and Official Capacities; | : | |
| BARBARA HEATH OF THE | : | |
| DEPARTMENT OF | : | |
| ANTHROPOLOGICAL | : | |
| ARCHAEOLOGY, | : | |
| in her Individual and Official Capacities; | : | |

INSTITUTIONAL REVIEW BOARD; :
LORA BEEBE, CHAIR OF THE :
INSTITUTIONAL REVIEW BOARD, :
in her Individual and Official Capacities; :
ROBERT WITHROW, ALTERNATIVE :
MEMBER OF :
INSTITUTIONAL REVIEW :
BOARD AND DIRECTOR OF HUMAN :
RESEARCH PROTECTION PROGRAM, :
in his Individual and Official Capacities; :
TAMI WYATT, INTERIM :
INSTITUTIONAL OFFICIAL OF :
INSTITUTIONAL REVIEW BOARD, :
in her Individual and Official Capacities; :
:
*Defendants.* :
_____:

Plaintiff Idil Issak seeks to publish, as the culmination of her eight years of graduate study, a dissertation that includes field work—something the Defendants and their Institutional Review Board ("IRB") Mandate currently prevent. That IRB Mandate applies to "human subject research" conducted under the auspices of the University of Tennessee-Knoxville ("University"), and, as such, it also bars Ms. Issak from discussing her earlier pilot studies. Defendants' conduct, as applied to Ms. Issak, violates her First Amendment right to freedom of speech. Ms. Issak seeks nominal damages, as well as declaratory relief and prospective injunctive relief that will allow her to speak freely about research she conducted while a student acting under the auspices of the University and to amend her dissertation to halt and remedy Defendants' ongoing violations of her First Amendment right to freedom of speech.

## INTRODUCTION

1. In August of 2018, after personal exposure to the human rights abuses suffered by Ethiopian domestic workers in the United Arab Emirates ("UAE"), Ms. Issak enrolled in the graduate program at the University of Tennessee-Knoxville to obtain a PhD in anthropology. Ms. Issak then spent the next eight years and hundreds of thousands of dollars with the intent of conducting

2

communicative field research on these workers' circumstances and culture and writing her dissertation on that subject.

2. On or about November 13, 2023, Ms. Issak's Doctoral Committee approved her proposed dissertation. Yet, the University required Ms. Issak to obtain IRB approval **before** conducting interviews that would form the basis of her dissertation.

3. Specifically, Defendants require social science researchers who seek to engage in research that involves communications with third parties to obtain permission from the IRB if the research seeks to contribute to generalizable knowledge. IRB's Standard Operating Procedures (hereinafter "SOPs"), Section 1.3, at 9.

4. On or about February 29, 2024, Ms. Issak first sought approval from the IRB to complete her field research for her dissertation. The IRB repeatedly rejected her application for nearly two years, continually adding new requirements for IRB approval.

5. After Ms. Issak filed suit in the above-captioned case, the IRB rejected Ms. Issak's latest IRB application again in October of 2025. This time the IRB added new, arbitrary, and unnecessary requirements for Ms. Issak to obtain IRB approval, including a requirement that would have rendered her ability to conduct her field research in time to complete the PhD program a practical impossibility. This rejection put Ms. Issak's entire PhD at risk, because the University requires doctoral students to complete their program within eight years. Defendants left Ms. Issak with no practical alternative but to abandon her speech, temporarily refrain from interviewing Ethiopian domestic workers, and write an interim dissertation, which differs significantly from that Ms. Issak seeks to publish.

6. Ms. Issak successfully defended a modified dissertation that was not bolstered with communicative field research and received her Doctor of Philosophy on May 16, 2026 in the Anthro-Cultural Anthropology program. Pending this lawsuit, she has embargoed the publication of that

3

modified dissertation. She seeks declaratory and equitable prospective injunctive relief in the form of reinstatement at the University to allow her to—without IRB approval—complete her field work and amend her dissertation, which would then be published.

7. Ms. Issak further seeks declaratory and equitable injunctive relief enjoining the Defendants from enforcing the IRB Mandate against her for advancing generalizable knowledge by speaking or writing about information she gained while a PhD student; specifically conversations she had in the UAE in 2019, 2021, and in or about 2023-2024, with employers, landlords, and adjacent community members, concerning domestic workers.

8. This lawsuit constitutes an as-applied challenge against employees and/or agents of the University of Tennessee in their individual and/or official capacities, the IRB operating in conjunction with the University of Tennessee, and employees and/or agents of the IRB in their individual and/or official capacities, alleging Defendants are abridging Plaintiff's First Amendment right to freedom of speech.

9. As further alleged below, the IRB Mandate establishes an unconstitutional licensing scheme that operates as a prior restraint on speech.

10. The IRB Mandate also constitutes an unconstitutional content-based, speaker-based and viewpoint-based restriction on speech and chills Ms. Issak's speech.

11. Additionally, the IRB lacks clear standards for determining whether researchers seeking to conduct communicative research must comply with the IRB Mandate. The IRB also lacks clear standards to guide the review process, with the IRB possessing unconstrained discretion to approve or reject an applicant's proposed communicative research.

12. IRB members also lack the necessary knowledge and expertise to evaluate proposed interview questions or surveys or to judge the importance of the research.

4

13. In short, the IRB Mandate in this case violates almost the full range of free speech doctrines, making it a First Amendment nightmare.

14. Accordingly, the Court should (1) declare the IRB Mandate unconstitutional; (2) enjoin the IRB and the Official-Capacity Defendants from enforcing the IRB Mandate as to Ms. Issak;[1] (3) order Defendants to reinstate Ms. Issak as a student, but without charging her tuition; (4) order Defendants to allow Ms. Issak two years to submit an addendum to her dissertation, defend that addendum, and then publish that dissertation; (5) order Defendants to then update their records to show Ms. Issak's amended dissertation as the dissertation completed for her PhD; and (6) award Ms. Issak $1 in nominal damages from each Individual-Capacity Defendant.

## JURISDICTION AND VENUE

15. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action arises under 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.[2]

16. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) as Defendant IRB maintains its principal place of business in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## PARTIES

17. Plaintiff Idil Issak is a natural person and a resident of Knoxville, Tennessee who is temporarily living in New York City.

18. Defendant Randy Boyd, President of the University of Tennessee System, is sued in his official capacity. As the President, Mr. Boyd holds executive management and administrative authority over all parts of the University, which, upon information and belief, includes responsibility

---

[1] Ms. Issak's challenge is limited to the application of the IRB Mandate to social science research, where the research involves solely communicative research. Plaintiff does not challenge the IRB Mandate to the extent it applies to federally funded research or medical research.

[2] The First Amendment is made applicable to the States through the Fourteenth Amendment. *See, e.g.,* *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 516 (1996).

5

and authority for the IRB Mandate challenged herein. Upon information and belief, Mr. Boyd holds responsibility and authority over enrollment decisions.

19. Defendant Donde Plowman, Chancellor of the University of Tennessee-Knoxville, is sued in her official capacity. As the Chancellor, Ms. Plowman holds responsibility for the administration and management of the campus, which upon information and belief, includes responsibility and authority for the IRB Mandate challenged herein. Upon information and belief, Ms. Plowman holds responsibility and authority over enrollment decisions.

20. Defendant Marieke Van Puymbroeck, Vice Provost and Dean of the Graduate School, is sued in her official capacity. Ms. Van Puymbroeck is directly involved in approving theses and dissertations, which upon information and belief, involves implementing the IRB Mandate challenged herein. Upon information and belief, Ms. Van Puymbroeck holds responsibility and authority over enrollment decisions.

21. Defendant Deborah Crawford, Vice Chancellor for Research, Innovation and Economic Development, is sued in her official capacity. Ms. Crawford oversees all research at the University of Tennessee-Knoxville, which upon information and belief, involves implementing the IRB Mandate challenged herein.

22. Defendant Brad Day, Associate Vice Chancellor for the Responsible Conduct of Research, is sued in his official capacity. Mr. Day is directly responsible for directing students through the IRB process and, upon information and belief, ensuring that they adhere to the IRB Mandate challenged herein.

23. Defendant Graciela S. Cabana, Director of Graduate Studies for the Department of Anthropology, is sued in her official capacity. Dr. Cabana is directly responsible for directing students through the graduate program and, upon information and belief, ensuring graduate students adhere

6

to the IRB Mandate challenged herein. Upon information and belief, Dr. Cabana holds responsibility and authority over enrollment decisions.

24. Upon information and belief, Defendant Gina Owens, is the College of Arts and Sciences Interim Divisional Dean for Social Sciences, and is sued in her official capacity. Ms. Owens is, upon information and belief, responsible for maintaining an environment that enables research, which involves implementing the IRB Mandate challenged herein.

25. Defendant Michael Blum, College of Arts and Sciences Associate Dean for Research and Creative Activity, is sued in both his individual and official capacities. Mr. Blum helps researchers meet compliance requirements before submitting research proposals, including, upon information and belief, directing compliance with the IRB Mandate challenged herein.

26. Defendant Barbara Heath, Department Head of Anthropological Archaeology,[3] is sued in both her individual and official capacities. Ms. Heath is directly involved with overseeing the structure of PhD Doctoral Committees, shepherding students through the IRB process, and upon information and belief, implementing the IRB Mandate challenged herein. Upon information and belief, Ms. Heath holds responsibility and authority over enrollment decisions for PhDs in anthropology.

27. Defendant Institutional Review Board ("IRB") is, upon information and belief, an entity operating at the University, independent of University control.

28. Defendant Dr. Lora Beebe, Chair of the IRB, is sued in both her individual and official capacities. As a member of the IRB, Ms. Beebe is directly involved in implementing and enforcing the IRB Mandate challenged herein.

---

[3] Defendants Boyd, Plowman, Van Puymbroeck, Crawford, Day, Cabana, Owens, Blum, and Heath, in their official capacities, are referred to jointly as "University Official-Capacity Defendants."

7

29. Defendant Robert Withrow, alternate member of the IRB and Director of Human Research Protection Program, is sued in both his individual and official capacities. As a member of the IRB, Mr. Withrow is directly involved in implementing and enforcing the IRB Mandate challenged herein.

30. Defendant Tami Wyatt, Interim Institutional Official of the IRB,[4] is sued in both her individual and official capacities. As a member of the IRB, Ms. Wyatt is directly involved in implementing and enforcing the IRB Mandate challenged herein.

31. Upon information and belief, Defendants all reside and/or work in Knoxville, Tennessee.

## STATEMENT OF FACTS

**A. Plaintiff Idil Issak's Background**

32. Plaintiff Idil Issak was born in Somalia but relocated to the United States in 1994 and is a United States citizen.

33. During her first year of college, Ms. Issak attended American University in Dubai, located in the UAE.

34. After her first year of college, Ms. Issak returned to the United States; she then obtained a Bachelor's Degree in Journalism from the University of Memphis.

35. Upon graduation, Ms. Issak returned to the UAE where she witnessed foreign female domestic workers suffering human rights abuses.

36. This injustice motivated Ms. Issak to obtain a second Bachelor's Degree in Anthropology from the University of Tennessee-Knoxville and then enter the PhD program at the

---

[4] Defendants Beebe, Withrow, and Wyatt, in their official capacities, are referred to jointly as "IRB Official-Capacity Defendants."

8

University of Tennessee so she could research, understand, and write about the mental and physical burdens carried by enslaved and/or abused foreign female domestic workers in the UAE.

**B.    The University of Tennessee's PhD Program**

37.    Obtaining a PhD at the University of Tennessee requires a substantial commitment of time and other resources. It may take as many as eight years and costs approximately $320,000 for an in-state resident and approximately $464,000 for an out-of-state resident.

38.    PhD candidates must take 48 credit hours of coursework, including 24 credit hours related to their dissertation.

39.    Non-course requirements include annual performance reviews, comprehensive written exams with oral defense components, submission of a formal dissertation proposal, and an oral presentation and oral defense of the candidate's dissertation.

40.    Before a student can apply for "Admission to Candidacy," a prospective PhD candidate must: a) complete coursework and satisfy GPA requirements; b) take and pass the Comprehensive Examination; c) establish a Doctoral Committee; and d) meet the residency requirement. Only after satisfying those conditions may a student defend his or her dissertation.

41.    The Comprehensive Examination has both a written and oral component.

42.    The written portion of the exam must be completed within seven days from when the student begins the exam.

43.    Students must complete the oral portion of the exam within two months after completion of the written portion.

44.    PhD candidates must complete all portions of the program within eight years of enrollment.

45.    Ms. Issak began the PhD program in or about August 2018 and thus was required to complete her PhD in or around August of 2026.

46.     Plaintiff completed both portions of the Comprehensive Examination by June 28, 2024.

47.     A Doctoral Committee must also approve a student's dissertation proposal within one semester of the student's completion of his or her Comprehensive Examination.

48.     The dissertation proposal includes the framework, background, questions to be answered and method of research for the PhD student's planned dissertation.

49.     The entire Doctoral Committee must approve the PhD student's dissertation proposal.

50.     Plaintiff's then-advisor, Dr. Raja Swamy, approved Ms. Issak's dissertation proposal on November 13, 2023.[5]

51.     On November 13, 2023, Ms. Issak successfully defended her dissertation proposal, with the Doctoral Committee approving her proposed PhD dissertation, entitled *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to Exploitation in the UAE*, that sought to focus on the plight of domestic workers in two of the seven United Arab Emirates—Sharjah and Ajman.

52.     In the dissertation proposal approved by her Doctoral Committee, Ms. Issak detailed the field work she would undertake, including communicative research in the form of focus group sessions, interviews, and observation.

53.     Conducting field work as part of a PhD program is considered a valuable experience, rendering the scholar more skilled and valuable in the eyes of future employers and the completed dissertation more respected academically and professionally.

---

[5] Ms. Issak did not select Dr. Swamy as her advisor. After Ms. Issak's original advisor left the University, Dr. Swamy, as the sole tenure-track cultural anthropology professor remaining at the University, by default, became both Ms. Issak's advisor and the Chair of her Doctoral Committee.

10

54. The members Ms. Issak selected for her Doctoral Committee consist of researchers with expertise in the subject matter of Plaintiff's dissertation.

55. Dr. Tamar Shirinian was originally part of Ms. Issak's Doctoral Committee and has a background in trauma research, which aligned with Plaintiff's dissertation goal of understanding the trauma Ethiopian domestic workers have undergone.[6]

56. Dr. Asafa Jalata also agreed to serve on Ms. Issak's Doctoral Committee: He is a leading scholar on Ethiopia and his work as a sociologist aligns with the goals of anthropological research.

57. Additionally, Dr. Kristin Monroe agreed to serve on the Doctoral Committee: She is an Associate Professor of Anthropology at the University of Kentucky and her expertise lies in doing research in the Middle East with vulnerable populations, which aligns with Plaintiff's dissertation goals.

58. On April 29, 2025, the University officially admitted Ms. Issak to PhD candidacy, establishing the Summer of 2026 for the conferral of her degree.

59. However, to obtain her degree, Ms. Issak needed to first complete and defend the dissertation the Doctoral Committee approved and, because of the IRB Mandate, before Ms. Issak could complete her dissertation, she needed IRB approval to conduct her communicative research.

## C.    The Institutional Review Board Mandate

60. If research seeks to contribute to generalizable knowledge, Defendants require social science researchers who seek to study and communicate with third parties to obtain permission from the IRB before conducting oral and/or written interviews forming the basis of their research, and

---

[6] Dr. Tamar Shirinian, who is married to Dr. Swamy, is also no longer a member of Ms. Issak's Doctoral Committee.

11

then to complete the research consistent with the IRB application and any terms or conditions of IRB approval.

61.     While the IRB functions primarily to comply with federal regulations, it "has the authority to approve, disapprove, monitor, and require modifications in all research activities that fall within its jurisdiction[.]" *What is the IRB?*, U. OF TENN.-KNOXVILLE: RSCH. INTEGRITY & ASSURANCE.

62.     The University provides detailed "procedures, standards, and requirements for research with human subjects under the auspices of the University of Tennessee, Knoxville, and the requirements of the IRB" in its SOPs. SOPs, Section 1.9 at 19.

63.     The SOPs provide that "[t]he IRB has jurisdiction over all human subjects research conducted under the auspices of The University of Tennessee, Knoxville, regardless of funding source or performance site." SOPs, Section 1.2 at 8.

64.     "Research under the auspices of the University of Tennessee, Knoxville includes research conducted at or using any property or facility of the University of Tennessee, Knoxville, conducted by or under the direction of any employee or agent of the university (including students) in connection with his or her university position or responsibilities . . . ." SOPs, Section 1.8 at 18; s*ee also* SOPs, Section 1.2 at 8.

65.     Research is defined "as a systematic investigation, including research development, testing and evaluation, designed to develop or contribute to generalizable knowledge." SOPs, Section 1.3 at 9-10.

66.     A systematic investigation is defined by the University as "[a]n activity that involves a prospective study plan that incorporates data collection, either quantitative or qualitative, and data analysis to answer a study question." SOPs, Section 1.3 at 11.

12

67. Generalizable knowledge is defined by the University as "[i]nvestigations . . . designed to draw general conclusions (i.e., knowledge gained from a study may be applied to populations outside of the specific study population), inform policy, or generalize findings." SOPs, Section 1.3 at 11.

68. However, not all communicative research requires IRB approval: The University provides examples of communicative activities that are not considered "research" for purposes of the IRB Mandate, including "[s]cholarly and journalistic activities (e.g., oral history, journalism, biography, literary criticism, legal research, and historical scholarship)," as well as "[p]ublic health surveillance activities . . . ." SOPs, Section 1.3 at 11.

69. The definition of "generalizable knowledge" is vague, leaving the IRB with largely unconstrained discretion to determine whether researchers must comply with the IRB Mandate.

70. Upon information and belief, the IRB *initially* concluded that Plaintiff's proposed communicative research involved "systematic investigation" designed to contribute to "generalizable knowledge" and was thus subject to the IRB Mandate.

71. For modifications to be made to research proposals, the IRB must review and approve the changes. *See* SOPs, Section 10.7 at 86 ("Investigators may wish to modify or amend approved research. Investigators must obtain IRB approval before making any changes, no matter how minor, in approved research unless the change is necessary to eliminate an apparent immediate hazard to the subject (in which case the IRB must then be notified at once)."); Section 10.7.1 at 86 ("The modifications may not be implemented until the IRB has reviewed and approved the proposed changes.").

72. The Defendants required Plaintiff to comply with the IRB Mandate even though the Doctoral Committee—with expertise aligned with Plaintiff's dissertation topic—already approved Ms. Issak's dissertation proposal.

13

73. To obtain IRB approval, researchers must submit to the IRB: a) a completed IRB application; b) recruitment and screening materials for the proposed research; c) informed consent documents; and d) data collection materials.

74. When a researcher seeks to interview individuals located outside the United States, the student must also obtain a letter stating whether the local government requires review and a memo of cultural appropriateness.

75. The requirement that researchers at the University obtain IRB approval and then complete their proposed research consistent with the application and any terms or conditions of approval is referred to as the "IRB Mandate."

**D. Ms. Issak's Efforts to Comply with the IRB Mandate**

76. Approximately three months after the Doctoral Committee approved Ms. Issak's dissertation proposal, she submitted, on or about February 29, 2024, her first application to the IRB.

77. Since then, Ms. Issak has amended and re-submitted her application to the IRB more than seven times, with the IRB never approving her research.

78. Ms. Issak initially sought expedited review from the IRB, but the IRB denied her request for expedited review.

79. Upon information and belief, the individual or individuals who reviewed Ms. Issak's application for expedited review lacked a scholarly expertise related to the subject matter of her proposed research despite the fact that the IRB SOPs provide that "[d]esignated reviewers must be professionally competent (i.e., experienced with and having demonstrated the ability to apply IRB review requirements and with *appropriate scientific or scholarly expertise*) to conduct expedited reviews." SOPs, Section 10.2.2 at 63 (emphasis added).

80. Upon information and belief, the IRB also did not have a cultural anthropologist review Ms. Issak's proposed communicative research before seeking clarifying and/or additional

14

information, even though the SOPs provide that "[w]hen the IRB is presented with a research study which may be outside of the knowledge base or representative capacity of the IRB members, an outside consultant will be sought . . . . Research studies for which appropriate expertise cannot be obtained for a given meeting will be deferred to another meeting when appropriate expertise is available." SOPs, Section 10.3.3 at 64.

81. Upon information and belief, none of the IRB members who reviewed Ms. Issak's proposed research had knowledge of the relevant laws of the UAE.

82. The IRB later refused to consider Ms. Issak's application because it wrongly believed she needed approval from the UAE to conduct research in the UAE.

83. Specifically, the May 17, 2024 IRB decision letter, signed by Defendant Beebe, stated: "Pursuant to the DOH [Department of Health] Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained."

84. Plaintiff responded to IRB Chair, Dr. Beebe, by explaining that the DOH Standard only applies to the Abu Dhabi emirate and that because she was only conducting her proposed communicative research in two different emirates—namely, Sharjah and Ajman—approval by an Ethics Committee in the UAE was not required.[7]

85. Ms. Issak and Defendant Beebe then exchanged several additional emails, with Dr. Beebe providing links purporting to support her claim UAE approval was required and with Ms. Issak explaining that one link provided applied only to a specific university in UAE and that the other links provided did not apply to Sharjah and Ajman—the emirates where Ms. Issak intended to conduct her communicative research.

---

[7] The UAE is a country in the Middle East comprised of seven emirates, each of which has unique laws.

15

86. In a May 21, 2024 email, Defendant Beebe responded that she "appreciated knowing that" and that she was "attending a conference this week and will reply in more detail later."

87. Defendant Beebe's May 21, 2024 email added that Defendant Withrow and Defendant Wyatt "are aware of your submission," with Beebe also adding both Withrow and Wyatt to the email thread.

88. Upon Beebe's return, Ms. Issak sent a follow-up email seeking clarity on the IRB's position, with Ms. Issak including both Defendants Withrow and Wyatt in her email response.

89. After multiple email exchanges, Ms. Issak wrote Defendants Bebee, Withrow, and Wyatt again on May 29, 2024, stating: "[Y]ou and the committee are mistaken ... [T]here are no laws in the UAE at the national level that requires a research ethics review for the social science research I am doing." Ms. Issak then asked for clarity on what precisely the IRB required to consider her application.

90. The IRB informed Plaintiff in a May 31, 2024 letter that "[i]n order to be placed on the full board agenda, all provisos within said outcome letter must be addressed and submitted by the required deadline of June 3, 2024. This includes proviso one, which states, "[p]ursuant to the DOH Standard on Human Subjects Research, this study requires approval from an Ethics Committee within the UAE. Please resubmit once this approval has been obtained.'"

91. The IRB's May 31, 2024 decision letter added: "As the student investigator has indicated the emirates in which research will be conducted do not require Ethics Committee approval, the IRB requires that the Memo of Cultural Appropriateness be revised to clearly state the emirates for which the signer has cultural and regulatory knowledge and whether or not those emirates require Ethics Committee approval to conduct the research procedures as described in the protocol."

92. The IRB refused to consider Plaintiff's application without this memorandum even though the DOH Standard expressly stated its purpose is "[t]o define the regulatory requirements for

16

the conduct of clinical research involving human subjects in the Emirate of Abu Dhabi," and even though Plaintiff's proposed research did not involve individuals in the Emirate of Abu Dhabi.

93. On June 3, 2024, Ms. Issak provided the IRB a letter confirming the DOH Standard does not apply to her research because she is not conducting research in Abu Dhabi: That letter stated "[w]hile there are Emirate-level regulations that apply to human-subjects research in Abu Dhabi, the same do not apply to research in Sharjah or Ajman."

94. On June 3, 2024, Defendant Wyatt also emailed Ms. Issak, accusing her of lacking professionalism in communicating with Defendant Beebe and informed Ms. Issak, that she had "asked the IRB Chair, IRB board members, and HRPP staff to keep [her] apprised of future communications received from [Ms. Issak] to monitor this situation."

95. On June 17, 2024, the IRB, in a letter signed by Defendant Beebe, again rejected Plaintiff's IRB application, directing Plaintiff to provide even more details concerning her planned communicative research, as well as demanding Ms. Issak explain how she intends to conduct a "comprehensive analysis" of the data.

96. The IRB later transmitted a further decision letter, dated August 2, 2024, and signed by Defendant Withrow on behalf of the IRB, stating, among other things: "Your application currently does not show that the project meets the definition for human subjects research as a systematic investigation designed to contribute to generalizable knowledge."

97. The IRB's August 2, 2024 letter represents the first time any Defendant indicated that Ms. Issak's research might not qualify as research subject to the IRB's jurisdiction.

98. And even though the IRB's "authority to approve, disapprove, monitor, and require modifications in all research activities" is limited to activities that "fall within its jurisdiction," and although the IRB jurisdiction is limited to research that involves a "systematic investigation" "designed to contribute to generalizable knowledge," the IRB in its August 2, 2024 letter did not disclaim

17

jurisdiction over Plaintiff's research. To the contrary, the IRB's letter instructed Plaintiff to further revise her application, leading Ms. Issak to reasonably fear that if she begins her communicative research without IRB approval, she would be subject to discipline and jeopardize her PhD.

99. Following her June 2024 submission, Ms. Issak was told that rather than submit her application through the computer system to the IRB, as she had done numerous times, she must submit it to Dr. Swamy, and that afterwards it would be sent to the Department Head Heath, next to the then-Arts and Science Divisional Dean Patrick Grzanka, next to Associate Dean for Research Blum, then to Withrow, and finally to the IRB committee.

100. Upon information and belief, the decision to alter the process for obtaining IRB approval was reached after Grzanka and Defendant Blum met with Defendants Beebe and Withrow, and later Defendant Heath. Ms. Issak was never allowed to attend those internal meetings.

101. The IRB, as a body, only reviews applications once per month, so every time individual members of the IRB requested clarification or additional information, it delayed consideration by the full board and prevented Ms. Issak from beginning her research.

102. In February 2025, Ms. Issak called Dr. Swamy and informed him that she was considering suing the IRB and had spoken with a legal organization about legal representation. Dr. Swamy told Ms. Issak if she sued the IRB or the University, he could no longer be her advisor.

103. During this call, Dr. Swamy told Ms. Issak, words to the effect, that she needed to decide between pursuing her PhD or a lawsuit, and that she couldn't pursue both.

104. Dr. Swamy spent approximately an hour yelling at Ms. Issak, telling her she couldn't beat University of Tennessee lawyers, and he then gave her an ultimatum, telling her to call him back when she decided whether she intended to pursue her lawsuit.

105. Ms. Issak never answered Dr. Swamy's ultimatum and instead continued communicating with him via email or text about her IRB application and other academic topics. The discussion was never raised again.

106. However, after Ms. Issak alerted Dr. Swamy to the possibility that she would file suit against the University, Dr. Swamy began demanding that she make extensive changes to her IRB application.

107. On June 24, 2025, Ms. Issak responded to Dr. Swamy's request for changes to her IRB application, confirming that she had "addresse[d] all official provisos from the IRB and [met] the key federal criteria[8] for ethical approval, which are focused on minimized risk, informed consent, and participant privacy. The application is ready for formal consideration by the board." Ms. Issak's June 24, 2025 email further addressed Dr. Swamy's purported concerns.

108. Dr. Swamy responded on June 25, 2025 that he would review her "document and get back [to her]," adding: "I will send it on to the Deans for review. They will decide if it is ready to move forward to the IRB for submission, given the need to ensure it does not get returned to you for another round of revisions."

109. Dr. Swamy and Ms. Issak then exchanged several emails discussing their respective views on her IRB application.

110. Then, on or about June 26, 2025, Dr. Swamy emailed Ms. Issak, claiming she was not adequately deferring to his recommendations, suggesting that she consider alternatives to completing her doctoral degree, and indicating that he would not continue as her advisor if she did not acquiesce to his direction. Dr. Swamy copied Grzanka and Defendants Cabana and Blum on the email, stating that "[c]onsidering the extremely difficult process we have been going through to get your IRB

---

[8] Federal regulations do not apply to Ms. Issak's research, but she nonetheless sought to meet or exceed federal standards.

19

application completed, I am starting to have serious doubts whether you will be able to conduct research . . . ." Dr. Swamy then accused Ms. Issak of taking a hostile tone and being unwilling "to work with" his recommendations.

111. Given Dr. Swamy's prior ultimatum and his suggestion that Ms. Issak would not be able to complete her degree, Ms. Issak decided to seek out a new advisor.

112. Simultaneously, on June 26, 2025, Ms. Issak, through counsel, requested that the University agree to stay the eight-year time-period for Ms. Issak to complete her PhD to ensure that the continuing delays did not threaten Ms. Issak's ability to complete her dissertation on a timely basis. Defendants indicated they would look into the request.

113. Because Ms. Issak believed she had addressed the IRB's concerns and desired to begin her research, and to expedite the IRB's review of her latest application, she submitted her revised application to the IRB on July 1, 2025, which was the July deadline for consideration by the IRB.

114. Ms. Issak informed Dr. Cabana of these facts in a July 1, 2025 email, adding that she "believe[d] at this point that the best way forward for me to complete my PhD on time is for me to obtain a new advisor."

115. In the application Ms. Issak submitted to the IRB on July 1, 2025, she renamed her dissertation *Unraveling the Complexities of Ethiopian Female Domestic Workers' Experiences and Their Responses to Working Conditions in the UAE*, omitted any proposed focus groups, and included proposed communicative research containing only 25% of the content she originally intended to research.

116. On July 1, 2025, Dr. Swamy replied to Ms. Issak's email, stating: "I had explicitly asked that you do not submit anything to the portal without formal approval. You still had not addressed the repeated requests to revise your application at numerous places. You nevertheless went ahead and did so. Since I am the [Principal Investigator] on this project, I will notify the IRB that this submission was made without my approval."

20

117. Dr. Swamy's email concluded: "If you feel you should be able to submit this application, you will need to address the changes required of you. Contact Dr. Cabana and me at the earliest if you would like to work towards resolving this situation."

118. The IRB rejected Ms. Issak's application because Dr. Swamy had not signed off on Plaintiff's proposed research.

119. Because of the IRB Mandate and because the IRB and IRB Official-Capacity Defendants did not approve her communicative research, Ms. Issak was prevented from conducting the necessary field research to write her dissertation, both as originally proposed and as narrowed in her later IRB applications.

120. The University also rejected Ms. Issak's request, through counsel, to agree to stay the eight-year time-period for her to complete the PhD program due to the pending litigation. Rather than litigation-specific consideration, Ms. Issak was directed to the "existing process for students" to seek an extension.

121. There was no guarantee, however, that the University would grant an extension through its "existing process," with that process requiring a student to first apply for an extension and provide a "timeline" and "target date" for completion of the degree—something that depended entirely on the outcome of this litigation. Then the Director of Graduate Studies must "endorse" a request for extension before it is sent to the Graduate School for consideration. Given Plaintiff's experience with the similarly subjective and discretionary IRB process, she had no faith that the University would timely or reasonably evaluate her request. Further, even if an extension was granted through the "existing process," it would require Ms. Issak to continue paying tuition.

122. Accordingly, Ms. Issak instead expeditiously reached out to three other faculty members to obtain new advisors and to then again seek IRB approval: Dr. Pendry and Dr. Clemons agreed to serve as advisors and new co-chairs on Ms. Issak's Doctoral Committee and Dr. Christian

21

agreed to serve on Ms. Issak's Doctoral Committee, replacing Drs. Swamy and Shirinian. The University approved Ms. Issak's request to change her advisors.

**E.    Defendants' Abridgement of Plaintiff's Free Speech Rights Threatened Her PhD**

123.    Although the Doctoral Committee approved Ms. Issak's dissertation proposal that included the valuable field work component consisting of conducting observation, focus group sessions, and interviews, Ms. Issak could not begin field work because of the IRB Mandate.

124.    Conducting research in violation of the IRB Mandate renders the researcher "subject to non-compliance and research misconduct reporting . . . to university officials," according to a *Human Research Protection Program FAQs* sheet the University produced. Because the IRB Mandate prevented Ms. Issak from beginning the field work necessary to complete her dissertation, she could not write or defend her dissertation—both of which were required for her to complete her PhD.

125.    At first the IRB Mandate merely delayed Ms. Issak's ability to complete her PhD, thereby increasing her educational expenses and delaying her entry into the workforce. However, eventually the IRB Mandate threatened Ms. Issak's ability to complete her dissertation on a timely basis, thereby putting at risk her PhD and the related years of effort and expense.

126.    Specifically, after Ms. Issak obtained new advisors and compiled a new Doctoral Committee, she again sought IRB approval in October of 2025.

127.    On or about October 16, 2025, the IRB deferred Ms. Issak's IRB application, after, upon information and belief, the full committee reviewed her application for the first time.

128.    In deferring Ms. Issak's IRB application, the IRB added two significant new requirements for IRB approval. First, the IRB directed Ms. Issak to "[l]ist the exact interview location prior to beginning any study activities. If the location is not yet confirmed, please acknowledge that an amendment will be required and approved by the IRB before data collection to update this site

22

information." And second, the IRB required Ms. Issak to create an "Adverse Event/Unanticipated Problem (AE/UP) Monitoring Plan[.]"

129. The IRB's requirement that Ms. Issak provide the "the exact interview location prior to beginning any study activities" and obtain IRB approval of the site information before data collection rendered it impractical for Ms. Issak to complete her field work because she could only arrange for a site to conduct interviews once in the UAE and it would be extremely costly and financially risky to travel to the UAE without approval from the IRB. And as the IRB, as a body, only reviews applications once per month, it might take as long as a month to obtain the approval from the IRB after she provided it with the address for a location for interviews, meaning Ms. Issak would be wasting time and money and further delaying her research.

130. Further, Ms. Issak's plan was to conduct the interviews in a variety of locations based on the preferences of the women who agreed to be interviewed, to avoid drawing any unnecessary attention to the domestic servants and to protect their privacy. The IRB's requirement that Ms. Issak provide "the exact interview location prior to beginning any study activities" interfered in the various steps Ms. Issak sought to take to protect the privacy of the women.

131. The IRB's failure to approve Ms. Issak's October 2025 IRB application and the IRB's decision to add new requirements for approval—that is, requiring Ms. Issak to identify the exact location at which she would conduct the interview and obtain IRB approval for that location prior to conducting interviews—put Ms. Issak's entire eight years of study and hundreds of thousands of dollars at risk by running Ms. Issak into the eight-year time frame for her to complete the PhD program.

132. Because of the IRB Mandate and because the IRB and IRB Official-Capacity Defendants did not approve her communicative research, Plaintiff was prevented from conducting

23

the necessary communicative research to write her dissertation, both as originally proposed and as Ms. Issak greatly narrowed in later IRB applications.

**F.      Defendants, In Effect, Censor Ms. Issak's Speech**

133.     Plaintiff discussed with her advisors ways to revise her dissertation proposal so that she could satisfy the academic rigors of the PhD program without needing IRB approval for her research.

134.     On December 1, 2025, Ms. Issak's counsel informed Defendants' counsel that Ms. Issak intended to temporarily change her research to focus on individuals, as opposed to contributing to generalizable knowledge, and that she accordingly tentatively intended to withdraw her IRB application.

135.     Specifically, Defendants were informed that given "the IRB's continued delays" and "unreasonable demands," Ms. Issak was compelled to limit her speech in her dissertation. The letter explained that Ms. Issak intended to collect the same data but, pending resolution of the case, would no longer seek "to develop or contribute to generalizable knowledge."

136.     Plaintiff's Counsel then asked Defendants to advise whether they believed Ms. Issak's revised research remained subject to the IRB Mandate.

137.     On December 10, 2025, Defendants responded, noting that they "agree[d] that if Ms. Issak has modified her project in a manner that does not require IRB review, then she is free to gather information and draft her dissertation with her committee's approval." Defendants, however, failed to state whether Ms. Issak's proposed amended research plan remained subject to the IRB Mandate.

138.     They further stated that "[i]f Ms. Issak intends to use any of her findings from this project in the future to contribute to generalizable knowledge, and if the project meets the definition of human subjects research in 45 C.F.R. § 46.102, she would need to undergo IRB review for

24

secondary usage of the gathered information. SOPs at 9, 16–18." Here, Defendants noted that "[s]hould Ms. Issak reapply for IRB approval of her dissertation, Defendants will assess whether use of prior, unapproved information she gathered is permissible under applicable laws and policies."

139. On December 11, 2025, Plaintiff sought clarification concerning "whether the University agrees that Ms. Issak may gather the same information she had previously sought to collect, without IRB approval, given that her data *could* later be used to develop or contribute to generalizable knowledge."

140. Defendants responded on December 15, 2025 by quoting from their initial response letter and then adding that "the response to your question depends on how Ms. Issak chooses to design her project." That email continued: "If it is designed to focus on specific individuals, then she might end up gathering information that overlaps with information that would be gathered during a systematic investigation, but IRB review would not be required for the reasons stated in our briefing." Conversely, Defendants stated that "if it is designed to contribute to generalizable knowledge, then IRB review would be required."

141. Indeed, further review of the SOPs demonstrates that Ms. Issak's original plan to collect the research prior to completing her dissertation would have been futile because "the IRB does not grant retroactive approval for research that has already been conducted." *Human Research Protection Program FAQs*, U. OF TENN.-KNOXVILLE: RSCH. INTEGRITY & ASSURANCE.

142. Defendants' refusals to either confirm that Ms. Issak did not need IRB approval if she avoided reaching generalizable conclusions or commit to extend the eight-year deadline forced Ms. Issak to abandon her plan to speak with domestic workers in the UAE and caused her to complete her dissertation instead by only using publicly available social media data and refraining from interviewing third parties.

25

143.    On March 31, 2026, in responding to interrogatories, Ms. Issak informed Defendants that the IRB Mandate caused her to change her dissertation, stating, "[a]nd most recently, since I am unable to conduct interviews for my dissertation due to Defendants' prior restraint, I have been conducting digital public data research namely by social media and other web-based communicative platforms, such as Reddit, to glean the needs, vulnerabilities, rights, and motives of Ethiopian domestic workers."

144.    In response to Defendants' interrogatory asking Ms. Issak to "[d]escribe all the ways you anticipate using, publishing, or sharing any of your Dissertation Research, including whether you intend to use any of it to contribute to generalizable knowledge," Ms. Issak further informed the Defendants that if this Court enjoined the IRB Mandate, she would seek an injunction allowing her to conduct the observations, focus groups, and interviews, "analyze the data and information [she] collect[s], update [her] dissertation to reach broad conclusions about that research and advance generalizable knowledge, publish [her] findings in an addendum to [her] dissertation, provide the updated dissertation to the committee, defend [the] updated dissertation, upload the amended dissertation to the Vireo database at the University, remove the embargo on [her] dissertation, and identify the research on [her] curricular vitae."

145.    Ms. Issak moved forward with those plans, researched and wrote her preliminary dissertation, defended that dissertation and received her Doctor of Philosophy on May 16, 2026 in the Anthro-Cultural Anthropology program.

146.    Ms. Issak submitted her preliminary dissertation to the Vireo database, as required by the University, but obtained a six-year embargo of her research, which will allow her the opportunity to revise the dissertation before it becomes publicly available.

**G.      Ms. Issak Still Seeks to Publish a Dissertation That Includes Field Work**

147.     Although Ms. Issak has received her PhD, she still seeks to include field work in her dissertation.

148.     However, the IRB Mandate and the IRB's decision to add a new demand for Ms. Issak to obtain IRB approval—that is, she provide the IRB a specific location at which she would interview participants in her research, which was infeasible given her methodology—rendered it a practical impossibility for Ms. Issak to conduct her intended field research and finish her PhD on time.

149.     Further, while the University allows students to seek an extension, there was no guarantee that such an extension would be granted and even if granted, the University then forces the PhD student to continue paying tuition until they complete their PhD. Such a delay also has a huge opportunity cost for students who cannot seek employment as a PhD.

150.     But Ms. Issak enrolled in the University's PhD program and spent eight years of her life and hundreds of thousands of dollars to obtain a PhD with a dissertation that included field work. And without field work, Ms. Issak's PhD is less valuable and her dissertation does not carry as much academic or scholarly worth; she will have fewer job prospects in both academia and the private sector. Equally as bad, without the field research, her dissertation will be less useful in bringing attention to, and associated relief for, the plight of the domestic workers.

151.     Thus, while the IRB Mandate forced Ms. Issak to temporarily abandon her efforts to interview domestic workers in the UAE for her dissertation, Ms. Issak still intends her dissertation to include her planned field communicative research that advances generalizable knowledge and seeks reinstatement at the University to complete that research—without IRB approval—and then to amend her dissertation.

27

**H. But for the IRB Mandate, Ms. Issak Would Also Speak About Conversations She Had During Pilot Studies She Conducted as a PhD Candidate Concerning Domestic Workers in the UAE**

152. Ms. Issak also seeks to advance generalizable knowledge by discussing information she gathered from interviews with individuals in the UAE as part of pilot studies she conducted in 2019, 2021 and 2023-2024, when she was a PhD student at the University.

153. Specifically, during the summer of 2019, Ms. Issak traveled to the UAE to conduct a pilot study related to Ethiopian domestic workers in the UAE. The primary goal of Ms. Issak's trip was to assess the feasibility of her intended fieldwork, including determining the time required to complete each step in the research process and ensuring the adequacy of ethical safeguards, such as informed consent and confidentiality protections.

154. In her 2019 pilot study, Ms. Issak also explored potential recruitment strategies across multiple access points, including Ethiopian community gatherings, gatekeepers, peer referrals, and religious institutions, while identifying potential barriers such as a lack of literacy, fear of employer retaliation, and immigration concerns. For this pilot study, Ms. Issak interviewed employers, landlords, and adjacent community members. During these conversations, the Ethiopian Consulate community center was repeatedly recommended to her as a good location to recruit and interview domestic workers. She also reviewed her research methodologies, including a draft questionnaire and interview guide, to ensure language accessibility across Amharic, Tigrinya, and Arabic, cultural appropriateness, and sensitivity around topics like abuse and wage theft. Additionally, Ms. Issak piloted her safety protocols, considered referral pathways to support services, and secured data storage procedures before returning to campus in the fall of 2019.

155. In 2021, Ms. Issak returned to the UAE to conduct a second exploratory study, as the research landscape had shifted significantly since her initial visit in 2019. The COVID-19 pandemic, coupled with mass deportations of Ethiopian domestic workers across the Arabian Gulf, had

fundamentally altered the local context and disrupted the community networks she had previously established. Accordingly, Ms. Issak needed to reassess the feasibility of her original study design, reestablish connections with key community contacts and gatekeepers, and evaluate whether her recruitment strategies and access points remained viable. In her second exploratory study, Ms. Issak essentially sought to understand how the shifting political and migration landscape had reshaped the Ethiopian domestic worker community in the UAE to allow her to adapt her research approach accordingly.

156. During Ms. Issak's second pilot study she met a former domestic worker, "Ann," who maintained a trusted relationship with many Ethiopian domestic workers and was thus a peer-proximate informant.

157. In 2023, Ms. Issak returned to the UAE, where during part of 2023 and 2024, she conducted archival and historical research for her dissertation. She also took Amharic lessons from "Ann," who agreed to serve as Ms. Issak's translator and interpreter for her field work. At this time, "Ann" advised Ms. Issak against using the Consulate community center as a research site because Ethiopian domestic workers deeply distrusted the Consulate and would not feel safe speaking freely near it.

158. Even though Ms. Issak has graduated from the University of Tennessee, the IRB Mandate limits how she may use information gleaned during the pilot studies. The Mandate applies to "human subjects research conducted under the auspices of The University of Tennessee, Knoxville, regardless of funding source or performance site." SOPs, Section 1.2 at 8.

159. But-for the IRB Mandate, Ms. Issak would seek to advance generalizable knowledge by speaking about the information she gathered from conversations she had in the UAE in 2019, 2021, and 2023-2024, such as by writing a methodology-focused paper. Such communicative research would advance generalizable knowledge, including among other things, by positing that an informant

29

or interviewee's class position and proximity to a participant group systematically shapes what they can see and convey about a vulnerable participant population's circumstances and safety. Here, Ms. Issak would incorporate and speak about her various interviews with employers, landlords, adjacent community members, and contrast that with what she learned from "Ann." This research would be complementary to Ms. Issak's research interest of Ethiopian domestic workers and advance not only generalizable knowledge but also Ms. Issak's research portfolio.

## I. The IRB Mandate Constitutes a Continuing Violation of Ms. Issak's First Amendment Rights

160.    Ms. Issak intends her dissertation to include an analysis of data she gathers from interviews she seeks to undertake to evaluate the adversities—mental and physical—faced by Ethiopian domestic workers in the UAE, while grouping the women qualitatively by common experiences.

161.    Defendants' IRB Mandate continues to cause Ms. Issak's dissertation to be a shell of the dissertation and PhD degree she attended the University of Tennessee to complete, despite the eight years of her life and hundreds of thousands of dollars she invested. Thus, the IRB Mandate constitutes a continuing violation of Ms. Issak's First Amendment rights. *See Carten v. Kent State Univ.*, 282 F.3d 391, 398 (6th Cir. 2002) (holding student expelled from the university, allegedly in violation of his rights under the ADA, stated a continuing violation of federal law and his request for reinstatement constituted a claim prospective relief, such that plaintiff's claim fell within the *Ex parte Young* exception to sovereign immunity).

162.    Further, Ms. Issak seeks to speak and advance generalizable knowledge by using information she obtained while a PhD student from conversations she had in the UAE in 2019, 2021, and 2023-2024, with employers, landlords, adjacent community members, and "Ann," concerning domestic workers.

163. Defendants' IRB Mandate prevents Ms. Issak from speaking about those conversations to advance generalizable knowledge and chills her speech: In fact, the Defendants, through counsel, informed Ms. Issak that should she use any of her findings "in the future to contribute to generalizable knowledge . . . she would need to undergo IRB review for secondary usage of the gathered information." Thus, the IRB Mandate continues to abridge Ms. Issak's First Amendment rights in this second way.

**J.      Ms. Issak Seeks Prospective Relief**

164. As detailed below, Ms. Issak seeks as a remedy an injunction enjoining the Official Capacity Defendants from enforcing the IRB Mandate and an injunction ordering her reinstatement to the University to allow her to complete her field work and update her dissertation to include an analysis of the data and information she collects, to advance generalizable knowledge, and to then defend that updated dissertation and have that dissertation published as her dissertation for her PhD.

**K.      The IRB Regulates Fully Protected Speech, Not Conduct**

165. Ms. Issak's efforts to develop and contribute to generalizable knowledge not only trigger coverage under the IRB Mandate, but also, in and of themselves, constitute speech within the meaning of the First Amendment. *See Chiles v. Salazar,* 146 S. Ct. 1010, 1023 (2026) (holding that "spoken word is perhaps the quintessential form of protected speech" and that was "exactly the kind of expression" in which the petitioner challenging Colorado's ban on "conversion therapy" sought to engage in by providing "talk therapy"); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[T]he creation and dissemination of information are speech within the meaning of the First Amendment.").

166. Ms. Issak intends her dissertation to include an analysis of data she gathers during observation, focus group sessions, and interviews that she will undertake as part of field work designed to evaluate the adversities—mental and physical—faced by Ethiopian domestic workers in the UAE, while grouping the women qualitatively by common experiences.

31

167. Plaintiff's research seeks to develop and contribute to generalizable knowledge by use of interviews, communications during observations and focus group sessions, and her written analyses of those communications, and thus Plaintiff's research consists wholly of protected speech. *See ETW Corp. v. Jireh Publ'g, Inc.*, 332 F.3d 915, 924 (6th Cir. 2003) (explaining that "[t]he protection of the First Amendment is not limited to written or spoken words"); *see also Burson v. Freeman*, 504 U.S. 191, 207 (1992) (referring to "exit polling" as "other types of speech"); *Connick v. Myers*, 461 U.S. 138, 149–50 (1983) (characterizing a survey as "speech").

168. Further, the fact that Ms. Issak's "speech" consists of questions, is of no matter for "[q]uestions, no less than forcefully stated opinions and facts, carry messages." *Connick*, 461 U.S. at 152.

169. Because Ms. Issak seeks to publish a dissertation that "develop[s] or contribute[s] to generalizable knowledge," her research is subject to the IRB Mandate.

170. Upon information and belief, Defendants would not require Ms. Issak to obtain IRB approval to publish a dissertation that included oral histories and/or if she did not seek to contribute to generalizable knowledge.

171. The Supreme Court has made clear that what "trigger[s] coverage," controls the determination of whether a regulation governs "speech" or "conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 28 (2010). Thus, if the so-called "conduct" that "trigger[s]" coverage "consists of communicating a message," then the law regulates speech. *Id.*

172. Because the IRB Mandate's applicability rests on the content of Plaintiff's speech—namely, whether her communicative research seeks to "develop or contribute to generalizable knowledge,"—the IRB Mandate regulates speech and not conduct. *Id.*; *see also Chiles*, 146 S. Ct. at 1023 (holding Colorado's ban on "conversation therapy," as applied to talk therapy, regulates speech and not conduct, explaining that speech does not "become conduct just because it can also be described

32

as a 'treatment,' a 'therapeutic modality,' or anything else," and adding that "[t]he First Amendment is no word game. And the rights it protects cannot be renamed away or their protections nullified by 'mere labels.'").

**L.** **The IRB Mandate Is an Unconstitutional Licensing Requirement and Thus a Prior Restraint**

173. By requiring Ms. Issak to comply with the IRB Mandate prior to engaging in speech related to her originally planned dissertation and/or research she undertook under the auspices of the University, the IRB Mandate constitutes a licensing system and an unconstitutional prior restraint.

174. Failure to comply with the IRB Mandate could subject Ms. Issak to discipline, as conducting research absent compliance with the IRB Mandate makes one "subject to non-compliance and research misconduct reporting to university officials."

175. Such authoritarian licensing of the "publication of literature" was practiced "[i]n Tudor England[,] [where] officers of the Crown were given roving commissions to search where they pleased in order to suppress and destroy the literature of dissent, both Catholic and Puritan[,]" however, it was thoroughly rejected in our Republic. *Stanford v. Texas*, 379 U.S. 476, 482 (1965).

176. The act of licensing "is to subject all freedom of sentiment to the prejudices of one man, and make him the arbitrary and infallible judge of all controverted points in learning, religion, and government." *Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 733–34 (1931) (quotations and citations omitted).

177. Accordingly, the Founding generation ratified the First Amendment to protect against such licensing mandates.

178. The reasoning is simple: If the permit scheme "involves appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940), by the licensing authority, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great" to be permitted. *See Promotions Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

33

179. Licensing, or prior review, of speech is additionally unconstitutional when it is discretionary, as "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quotations and citations omitted).

180. A restriction that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. City of Baxley*, 355 U.S. 313, 322 (1958).

181. The IRB lacks narrow, objective, and definite standards to guide its review of applications and instead possesses unconstrained discretion to both determine whether the IRB Mandate applies and then to appraise facts, exercise judgment, and formulate opinions concerning whether to approve the proposed communicative research.

182. Specifically, the SOPs provide that "[r]eviewing officials may strengthen requirements and/or conditions, or add other modifications before approval, or may require approval by an additional committee, office, or person." SOPs, Section 8.1 at 50.

183. In refusing to approve Ms. Issak's applications, the IRB made numerous judgments that involved significant and unfettered discretion, such as determining the "importance of the knowledge" to be gained and whether the "[r]isks to subjects" from interviews "are reasonable in relation to anticipated benefits" flowing from the research. SOPs, Section 10.4 at 67.

184. Further, the IRB partially outsourced its discretion to approve communicative research to noncitizens by requiring applicants to obtain letters of "cultural appropriateness" from a local authority.

34

185. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988).

186. By adopting, implementing, and enforcing the IRB Mandate, Defendants are restraining and chilling Ms. Issak's speech.

187. Upon information and belief, the IRB Mandate has also chilled some other graduate students' speech by prompting them to modify their proposed dissertations or causing them to opt for degrees that are not subject to the IRB Mandate.

**M.    The IRB Mandate Establishes an Unconstitutional Condition**

188. The IRB Mandate requires Ms. Issak to either succumb to the speech restraints dictated by the Defendants or abandon her speech. In other words, Defendants have conditioned Ms. Issak's ability to obtain a PhD on her forfeiting her First Amendment rights.

189. The unconstitutional conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 604 (2013).

190. "The government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio v. Hodges*, 917 F.3d 908, 911 (6th Cir. 2019).

**N.    The IRB Mandate Constitutes a Content-Based Restriction on Speech Subject to Strict Scrutiny**

191. The IRB Mandate creates a content-based regulation because whether research is subject to the IRB Mandate depends on the content of the speech.

192. Specifically, the IRB Mandate distinguishes between communicative research designed to produce "generalizable" knowledge and research focused on "non-generalizable" knowledge, with the IRB Mandate applying to the former communicative research, but not the latter.

35

193. Thus, "[s]cholarly and journalistic activities" such as "oral history, journalism, biography, literary criticism, legal research, and historical scholarship" generally do not require IRB approval because they purportedly do not produce "generalizable" knowledge. 45 C.F.R. § 46.102(l)(1).

194. "Regulation of speech is content-based and therefore subject to strict scrutiny 'if a law applies to particular speech because of the topic discussed or the idea or message expressed'; some obvious facial distinctions based on a message include 'defining regulated speech by particular subject matter' or 'by its function or purpose.'" *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 703 (6th Cir. 2020) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)).

195. The Supreme Court in *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987), found a state tax content-based where the statute drew a distinction similar to the "generalizable"/"non-generalizable" knowledge distinction the IRB Mandate adopts.

196. In *Ragland*, the Court held that a tax on "general interest" magazines, but not on religious, trade, professional, and sports ones, was content based. *Id.* at 223, 230. Put plainly, "a magazine's tax status depend[ed] entirely on its *content.*" *Id.* at 229.

197. In that case, to determine whether the tax applied to a magazine, the "enforcement authorities [had to] necessarily examine the content of the message that [was] conveyed." *Id.* at 230 (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

198. Under *Ragland*, then, the IRB Mandate's distinction between "generalizable" and "non-generalizable" knowledge represents a content-based restriction on speech.

199. "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

36

200.    Further, such content-based regulations are "subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993)).

201.    "Only rarely are statutes sustained in the face of strict scrutiny." *Bernal v. Fainter*, 467 U.S. 216, 229 n.6 (1984).

**O.    The IRB Mandate Is a Speaker-Based Restriction of Speech Subject to Strict Scrutiny**

202.    Not only does the IRB Mandate constitute a content-based regulation, but it is also a speaker-based regulation on speech.

203.    The IRB Mandate imposes a speaker-based restriction similar to that at issue in *Ragland*—just as the tax scheme in that case treated "general interest" magazines "less favorably than others," 481 U.S. at 229, the IRB Mandate treats speakers addressing "generalizable knowledge" less favorably than others.

204.    Specifically, the IRB Mandate treats speech by historians, journalists, and behavioral scientists differently, with historians and journalists generally not subject to the IRB Mandate because they do not intend to contribute to "generalizable knowledge." *Cf.* Letter from Michael A. Carome, Assoc. Dir. for Regul. Affairs, Off. for Hum. Rsch. Prots. to Linda Shopes and Donald Ritchie, Leaders of the Oral History Ass'n (Sept. 22, 2003)[9] ("Oral History Letter").

205.    Even though historians conducting oral-history research systematically conduct interviews and "reach for meaning that goes beyond the specific subject of their inquiry," the government assumes that such historians, unlike researchers in the behavioral sciences, "do not reach for generalizable principles of historical or social development; nor do they seek underlying principles

---

[9] https://research.unl.edu/orr/docs/OHRPResponsetoOralHistories.pdf.

or laws of nature that have predictive value and can be applied to other circumstances for the purpose of controlling outcomes."[10] And thus generally the IRB Mandate does not apply to oral historians.

206. Conversely, the IRB Mandate applies to Plaintiff's communicative research because Ms. Issak seeks to qualitatively group participants to identify patterns, to delineate common themes, and then to speak about generalizable principles in her dissertation.

207. Accordingly, because the IRB Mandate applies to Ms. Issak as a qualitative researcher, but does not apply to historians or journalists, the IRB Mandate constitutes a speaker-based regulation. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

208. Upon information and belief, Defendants would not require historians and journalists who conduct equivalent communicative research to comply with the IRB Mandate if they do not seek to speak about generalizable principles.

209. Given the inconsistencies and exceptions to the application of the IRB Mandate, the IRB Mandate in the social sciences lacks any congruence with a legitimate goal and thus cannot satisfy strict scrutiny. *See Reed*, 576 U.S. at 168–70 (quoting *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 658 (1994)) ("[L]aws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference.").

**P. The IRB Mandate Establishes a Viewpoint-Based Regulation of Speech Subject to Strict Scrutiny**

210. Further, the IRB Mandate establishes a viewpoint-based regulation of speech by requiring researchers conducting research internationally to obtain a letter stating the research is

---

[10] *Id.*

deemed "culturally appropriate" in the country where the research will take place, making third parties the arbiters of what communicative research is allowed based on the viewpoint of the research.

211. Government discrimination among viewpoints—those targeting "particular views"—is a "more blatant" and "egregious form of content discrimination." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

212. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder v. Phelps*, 562 U.S. 443, 458 (2011) (quoting *Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

213. Further, "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

214. "Both content- and viewpoint-based discrimination are subject to strict scrutiny. No state action that limits protected speech will survive strict scrutiny unless the restriction is narrowly tailored to be the least-restrictive means available to serve a compelling government interest." *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 248 (6th Cir. 2015) (internal citations omitted).

215. The IRB Mandate's requirement that an applicant obtain a statement of the cultural appropriateness of the research, is a viewpoint-based restriction and thus a further unconstitutional abridgment of speech. *Chiles*, 146 S. Ct. at 1024, 1029 (holding Colorado's ban on "conversion therapy" prescribes the views a talk therapist "may and may not express," and thus constituted a "viewpoint restrictions" that is subject to strict scrutiny because "the First Amendment stands as a shield against any effort to enforce orthodoxy in thought or speech in this country"); *see also McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995) (explaining the very "purpose behind the Bill of Rights, and of the First Amendment in particular: to protect unpopular individuals['] . . . ideas from suppression . . . at the hand of an intolerant society").

39

**Q.    University Official-Capacity Defendants Hold Responsibility for, and Authority Over, the Adoption, Implementation, or Enforcement of the Unconstitutional IRB Mandate**

216.    Each University Official-Capacity Defendant, by virtue of his or her position at the University and the responsibilities and authority of that position, is causing the deprivation of Ms. Issak's First Amendment rights.

217.    A Section 1983 suit seeking prospective declaratory and injunctive relief against official-capacity defendants, need not allege "personal involvement" of the officials; rather, "[a] plaintiff must allege facts showing how a state official is connected to, or has responsibility for, the alleged constitutional violations." *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013); *see also Floyd v. Cnty. of Kent*, 454 F. App'x 493, 499 (6th Cir. 2012) (citing *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988) ("The state official sued, however, must have, by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains.")).

218.    Defendant Boyd, as President of the University of Tennessee System, holds executive management and administrative authority over all component parts of the University, and upon information and belief, holds both responsibility and authority over the maintenance of, or enforcement of, the IRB Mandate challenged herein, as well as over enrollment decisions.

219.    Defendant Plowman, as Chancellor of the University of Tennessee-Knoxville, holds responsibility for the administration and management of the campus and upon information and belief, holds responsibility and authority over the maintenance of, or enforcement of, the IRB Mandate challenged herein, as well as over enrollment decisions.

220.    Defendant Van Puymbroeck, as Vice Provost and Dean of the Graduate School, holds responsibility for approving theses and dissertations and upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein, as well as over enrollment decisions.

40

221. Defendant Crawford, Vice Chancellor for Research, holds direct responsibility for overseeing all research at the University of Tennessee-Knoxville and, upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

222. Defendant Day, Associate Vice Chancellor for the Responsible Conduct of Research, holds direct responsibility for directing students through the IRB process and upon information and belief, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

223. Defendant Cabana, Director of Graduate Studies for the Department of Anthropology, holds direct responsibility for directing students through the graduate program and upon information and belief, holds responsibility and authority over graduate students to ensure they adhere to the IRB Mandate challenged herein, as well as over enrollment decisions.

224. Defendant Owens, Interim Divisional Dean for Social Sciences in the College of Arts and Sciences, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

225. Defendant Blum, the Associate Dean for Research and Creative Activity in the College of Arts and Sciences, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein.

226. Defendant Heath, as Department Head of Anthropological Archaeology, holds responsibility and authority over the enforcement and implementation of the IRB Mandate challenged herein, as well as over enrollment decisions.

227. Upon information and belief, University Official-Capacity Defendants, individually or in combination, have allowed certain researchers to conduct communicative research without complying with the IRB Mandate.

41

**R.** **IRB Official-Capacity Defendants Hold Responsibility for, and Authority Over, the Adoption, Implementation, or Enforcement of the Unconstitutional IRB Mandate**

228. Each IRB Official-Capacity Defendant, by virtue of his or her position on the IRB and the responsibility and authority of that position, caused and is continuing to cause a deprivation of Ms. Issak's First Amendment rights.

229. Defendant Beebe, as Chair of the IRB, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

230. Defendant Withrow, as alternate member of the IRB and Director of the Human Research Protection Program, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

231. Defendant Wyatt, as Interim Institutional Official of the IRB, holds responsibility and authority over the maintenance, implementation, and enforcement of the IRB Mandate challenged herein.

232. Upon information and belief, IRB Official-Capacity Defendants, individually or in combination, have allowed certain researchers to conduct communicative research without complying with the IRB Mandate.

**S.** **The IRB Is Not an Arm of the State**

233. The Institutional Review Board is not an "arm of the State" shielded by sovereign immunity.

234. There are several factors to consider when determining if an entity is an arm of the state. *See Laborers' Int'l Union of N. Am., Local 860 v. Neff*, 29 F.4th 325, 330 (6th Cir. 2022) (sovereign "immunity applies only to lawsuits against the State or 'an arm of the state'" (citations omitted)). The Supreme Court considers: "(1) the State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of

42

the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government." *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005) (citations omitted) (citing *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 44–45, 51 (1994)).

235. The Sixth Circuit's factors are similar: "(1) whether the state would be responsible for a judgment against the entity in question; (2) how state law defines the entity; (3) what degree of control the state maintains over the entity; and (4) the source of the entity's funding." *Id.* (quoting *S.J. v. Hamilton Cnty.*, 374 F.3d 416, 420 (6th Cir. 2004)).

236. In a June 3, 2024 email, Defendant Wyatt, the Interim Institutional Official of the IRB, stated that the IRB "is an independent entity separate from the [Human Research Protection Program] of the University."

237. Upon information and belief, the IRB is an entity operating at the University and a University official appoints IRB members, but the IRB is not subject to control by either the University or the State of Tennessee.

238. Upon information and belief, the IRB functions independently from the University of Tennessee. *See* SOPs, Section 1.10.4 at 22 ("The IRB functions independently of, but in coordination with, other organizational committees and officials. The IRB, however, makes independent determinations whether to approve, require modification in, or disapprove research based on whether human subjects are adequately protected.").

239. Upon information and belief, the State does not have any veto power over the IRB's actions. *See* SOPs, Section 1.2 at 9 ("[N]o one at The University of Tennessee Knoxville shall approve the implementation of human subject research that has not been approved by the IRB nor may anyone override a decision of the IRB.").

240. Upon information and belief, the IRB does not "carr[y] out a long-recognized state function," since licensing of speech is unconstitutional. *Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 764

(6th Cir. 2010); *see also Staub v. City of Baxley*, 355 U.S. 313, 322 (1958) (a restriction that "makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms").

241. Further, IRB's functions do not fall within the traditional purview of state or local government, with the IRB functioning primarily to comply with federal regulations particularly related to federally funded research. The IRB is thus a political subdivision to which the Eleventh Amendment does not extend.

**T.      University Individual-Capacity Defendants Have Personally Caused and Are Personally Causing the Deprivation of Ms. Issak's First Amendment Rights**

242. Each University Individual-Capacity Defendant, acting under color of state law, has personally caused and is personally causing the deprivation of Ms. Issak's First Amendment rights detailed above through their individual communications and interactions with Ms. Issak and by making clear that Ms. Issak must comply with the IRB Mandate, including to write her field research-based dissertation or to speak about research she conducted under the auspices of the University.

243. "Section 1983 imposes liability only on a defendant who was personally involved in the unconstitutional action that caused the plaintiff's injury." *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 491 (6th Cir. 2020).

244. Personal involvement can exist in a variety of situations, including, among other things, where a state actor "at least implicitly authorized, approved or knowingly acquiesced" in an alleged unconstitutional violation, *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (citation omitted); where a defendant condoned the unconstitutional conduct; or where a defendant "encouraged the specific incident of misconduct or in some other way directly participated in it." *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016).

44

245. Defendant Blum directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights by, among other things, directly and personally coordinating with the other Defendants about Ms. Issak's IRB application and the procedures which Ms. Issak must use to comply with the IRB Mandate; upon information and belief, participating in the October 9, 2024 meeting announcing the new procedures Ms. Issak and other social science researchers must use to comply with the IRB Mandate; directly and personally coordinating with Dr. Swamy to implement the new procedures instituted to enforce the IRB Mandate against Ms. Issak; and directly and personally reviewing IRB applications for social science researchers to assess whether the IRB application complied with the IRB Mandate before routing it to the IRB.

246. Defendant Heath directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights by, among other things, directly and personally coordinating with the other Defendants about Ms. Issak's IRB application and the procedures which Ms. Issak must use to comply with the IRB Mandate; directing students to attend the October 9, 2024 meeting announcing the new procedures Ms. Issak and other social science researchers must use to comply with the IRB Mandate; and directly and personally reviewing IRB applications for social science researchers to assess whether the IRB application complied with the IRB Mandate before routing it to the IRB.

**U. IRB Individual-Capacity Defendants Have Personally Caused and Are Personally Causing the Deprivation of Ms. Issak's First Amendment Rights**

247. Each IRB Individual-Capacity Defendant, acting under color of state law, has personally caused and is personally causing the deprivation of Ms. Issak's First Amendment rights detailed above through their individual communications and interactions with Ms. Issak and by making clear that Ms. Issak must comply with the IRB Mandate, including to write her intended dissertation or to speak about research she conducted under the auspices of the University.

45

248.     Defendant Beebe directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights by, among other things, directly and personally applying the unconstitutional IRB Mandate to Ms. Issak, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed and intended communicative research without subjecting herself to disciplinary action. Defendant Beebe signed six of Ms. Issak's outcome letters dated March 25, 2024; May 17, 2024; May 31, 2024; June 17, 2024; July 29, 2024; and October 21, 2025, preventing her from engaging in First Amendment protected speech.[11] The October 21, 2025 letter also included two brand new requirements: "List the exact interview location prior to beginning any study activities. If the location is not yet confirmed, please acknowledge that an amendment will be required and approved by the IRB before data collection to update this site information," and to create an "Adverse Event/Unanticipated Problem (AE/UP) Monitoring Plan."

249.     Defendant Withrow directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights by, among other things, directly and personally applying the unconstitutional IRB Mandate to Ms. Issak, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed and intended communicative research without subjecting herself to disciplinary action. Defendant Withrow signed one of Ms. Issak's outcome letters on August 2, 2024, as well as a July 9, 2025 outcome letter, preventing her from engaging in First Amendment protected speech, and was the analyst responsible for reviewing her applications.

---

[11] Although Defendant Beebe's signature appears on the October 21, 2025 letter, it appears above a signature line for Renee Smith, the Vice Chair for the IRB.

250. Defendant Wyatt directly participated in and implicitly authorized, approved, knowingly acquiesced in, encouraged, and/or condoned the specific violations of Ms. Issak's First Amendment rights by, among other things, directly and personally applying the IRB Mandate to Plaintiff, requiring Ms. Issak to obtain a statement of cultural appropriateness, and coordinating with other members of the IRB to apply the IRB Mandate to Ms. Issak, thereby preventing Ms. Issak from engaging in her proposed and intended communicative research without subjecting herself to disciplinary action.

## FIRST CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
### in Violation of the First Amendment
### Against University Official-Capacity Defendants

251. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

252. The University's IRB Mandate establishes an unconstitutional licensing scheme and prior restraint on Ms. Issak's speech.

253. The University's IRB Mandate unconstitutionally grants unfettered discretion to the IRB to grant, deny, or establish conditions on Ms. Issak's speech.

254. The University's IRB Mandate unconstitutionally chills and abridges Ms. Issak's speech and leaves her current communicative research and dissertation effectively censored.

255. Absent Court intervention, the University's IRB Mandate will have unconstitutionally conditioned Ms. Issak's ability to obtain a PhD on Ms. Issak forfeiting her First Amendment rights.

256. The University's IRB Mandate represents an unconstitutional content-based regulation of speech by applying to research seeking to advance "generalizable" knowledge but not to research concerning "non-generalizable" knowledge.

47

257. The University's IRB Mandate represents an unconstitutional speaker-based regulation of speech by applying to social scientists communicating about generalizable knowledge but not to researchers, such as journalists and historians, who do not conduct research to advance generalizable knowledge.

258. The University's IRB Mandate represents an unconstitutional viewpoint-based regulation of speech because it requires Ms. Issak to establish her research is "culturally appropriate."

259. The University lacks a compelling governmental interest to justify the IRB Mandate, as applied to Ms. Issak.

260. The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

261. The University Official-Capacity Defendants, acting under color of state law and by virtue of their offices, are each responsible for the adoption, implementation, oversight, and/or maintenance of, or enforcement of, the University's unconstitutional IRB Mandate.

262. Ms. Issak seeks prospective equitable relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research that is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment, and entry of a permanent injunction barring the University Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's speech based on research she conducted while a PhD student.

263. Ms. Issak seeks further prospective equitable relief requiring the University Official-Capacity Defendants to readmit Ms. Issak to the University, without cost, and allow her to complete her field work without IRB approval, revise her dissertation, defend that revised dissertation, and publish the revised dissertation as Ms. Issak's dissertation for her PhD.

## SECOND CLAIM FOR RELIEF

48

**42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech**
**in Violation of the First Amendment**
**Against University Defendants Blum and Heath**
**in Their Individual Capacities**

264. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

265. Defendants Blum and Heath, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which constitutes an unconstitutional licensing scheme and unlawful prior restraint on Ms. Issak's speech, and which continues to unconstitutionally chill Ms. Issak's speech.

266. Defendants Blum and Heath, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which provides the IRB unconstitutionally unconstrained and unmoored discretion.

267. It has long been clearly established that discretion afforded to a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." (quotations and citations omitted)). Further, "[w]hile [p]rior restraints are not unconstitutional per se . . . [a]ny system of prior restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990) (citations omitted).

268. Defendants Blum and Heath, acting under color of state law, have personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional condition to obtain her PhD.

Case 3:25-cv-00238-KAC-JEM    Document 76-1    Filed 06/15/26    Page 49 of 58
PageID #: 2803

269. It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911 (citation omitted).

270. Defendants Blum and Heath, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional content-based restriction based on Ms. Issak's intent to produce "generalizable" knowledge; the IRB Mandate does not apply to communicative research about "non-generalizable" knowledge.

271. It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

272. Defendants Blum and Heath, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional speaker-based restriction on her speech because Ms. Issak is a social scientist communicating about generalizable knowledge; the IRB Mandate does not apply to historians or journalists speaking about non-generalizable knowledge.

273. It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

274. Defendants Blum and Heath, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional viewpoint-based requirement that Ms. Issak

50

establish her proposed research is "culturally appropriate," making Ms. Issak's ability to conduct communicative research subject to the viewpoint of her speech.

275. It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (quoting *Reed*, 576 U.S. at 180 (Kagan, J., concurring)).

276. Plaintiff seeks nominal damages of $1 from Defendants Blum and Heath for the above violations of her First Amendment rights.

## THIRD CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech in Violation of the First Amendment
### Against IRB Official-Capacity Defendants

277. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

278. The IRB Mandate establishes an unconstitutional licensing scheme and prior restraint on Ms. Issak's speech.

279. The IRB Mandate unconstitutionally grants unfettered discretion to the IRB to grant, deny, or establish conditions on Ms. Issak's speech.

280. The IRB Mandate unconstitutionally chills and abridges Ms. Issak's speech and leaves her current communicative research and dissertation effectively censored.

281. Absent Court intervention, the IRB Mandate will have unconstitutionally conditioned Ms. Issak's ability to obtain a PhD on Ms. Issak forfeiting her First Amendment rights.

282. The IRB Mandate represents an unconstitutional content-based regulation of speech by applying to research seeking to advance "generalizable" knowledge but not to research concerning "non-generalizable" knowledge.

51

283. The IRB Mandate represents an unconstitutional speaker-based regulation of speech by applying to social scientists communicating about generalizable knowledge but not to researchers, such as journalists and historians, who do not conduct research to advance generalizable knowledge.

284. The IRB Mandate represents an unconstitutional viewpoint-based regulation of speech because it requires Ms. Issak to establish her research is "culturally appropriate."

285. The IRB Official-Capacity Defendants lacks a compelling governmental interest to justify the IRB Mandate, as applied to Ms. Issak.

286. The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

287. The IRB Official-Capacity Defendants, acting under color of state law and by virtue of their offices, are each responsible for the adoption, implementation, oversight, and/or maintenance of, or enforcement of, the unconstitutional IRB Mandate.

288. Ms. Issak seeks prospective equitable relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research that is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment, and entry of a permanent injunction barring the IRB Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's speech based on research she conducted while a PhD student.

289. Ms. Issak seeks further prospective equitable relief enjoining the IRB Official-Capacity Defendants from requiring Ms. Issak to obtain IRB approval to complete her field work, revise her dissertation, defend that revised dissertation, and publish her revised dissertation as the dissertation completed for her PhD.

52

## FOURTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
### in Violation of the First Amendment
### Against IRB Defendants Beebe, Wyatt, and Withrow in Their Individual Capacities

290. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

291. Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which constitutes an unconstitutional licensing scheme and unlawful prior restraint on Ms. Issak's speech and which continues to unconstitutionally chills Ms. Issak's speech.

292. Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate, which provides the IRB unconstitutionally unconstrained and unmoored discretion.

293. It has long been clearly established that discretion awarded a licensing body must be constrained. *See Forsyth Cnty.*, 505 U.S. at 131 ("[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license must contain narrow, objective, and definite standards to guide the licensing authority." (quotations and citations omitted)). Further, "[w]hile [p]rior restraints are not unconstitutional per se . . . [a]ny system of prior restraint . . . comes to this Court bearing a heavy presumption against its constitutional validity." *FW/PBS, Inc*, 493 U.S. at 225 (citations omitted).

294. Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional condition, to obtain her PhD.

295.     It has long been clearly established that "[t]he government may not deny an individual a benefit, even one an individual has no entitlement to, on a basis that infringes his constitutional rights." *Planned Parenthood of Greater Ohio*, 917 F.3d at 911 (citation omitted).

296.     Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional content-based restriction based on Ms. Issak's intent to produce "generalizable" knowledge; the IRB Mandate does not apply to communicative research about "non-generalizable" knowledge.

297.     It has long been clearly established that content-based speech restrictions are "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163.

298.     Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional speaker-based restriction on her speech because Ms. Issak is a social scientist communicating about generalizable knowledge; the IRB Mandate does not apply to historians or journalists speaking about non-generalizable knowledge.

299.     It has long been clearly established that speaker-based restrictions are subjected to heighted scrutiny and that speaker-based restrictions with a similar lack of governmental justification are unconstitutional. *See Sorrell*, 564 U.S. at 564 (holding that a prohibition on disseminating prescriber-identifying information, only if it would be used for marketing, was speaker-based because it "disfavor[ed] specific speakers, namely pharmaceutical manufacturers").

300.     Defendants Beebe, Wyatt, and Withrow, acting under color of state law, have personally caused and are personally causing the deprivation of Ms. Issak's First Amendment rights

54

by requiring Ms. Issak to comply with the IRB Mandate's unconstitutional viewpoint-based requirement that Ms. Issak establish her proposed research is "culturally appropriate," making Ms. Issak's ability to conduct communicative research subject to the viewpoint of her speech.

301. It has long been clearly established that "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828. "[I]t is the 'rare case in which a speech restriction withstands strict scrutiny.'" *Susan B. Anthony List v. Driehaus*, 814 F.3d 466, 473 (6th Cir. 2016) (quoting *Reed*, 576 U.S. at 180 (Kagan, J., concurring)).

302. Plaintiff seeks nominal damages of $1 from Defendants Beebe, Wyatt, and Withrow for the above violations of her First Amendment rights.

## FIFTH CLAIM FOR RELIEF

### 42 U.S.C. § 1983: Abridgement of Ms. Issak's Right to Freedom of Speech
### in Violation of the First Amendment
### Against the IRB

303. Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs of this Complaint.

304. The IRB, acting under color of state law, maintains a custom or policy that requires social science researchers who conduct communicative research to comply with the IRB Mandate if the researcher seeks "to develop or contribute to generalizable knowledge."

305. The IRB, acting under color of state law, maintains a custom or policy that grants the IRB significant and unfettered discretion in applying the IRB Mandate.

306. The IRB, acting under color of state law, maintains a custom or policy that requires social science researchers to obtain a letter stating research conducted internationally is "culturally appropriate."

55

307. Pursuant to its custom or policy, the IRB applies the IRB Mandate's unconstitutional licensing scheme and prior restraint to Ms. Issak's speech, violating Ms. Issak's First Amendment rights.

308. Pursuant to its custom or policy, the IRB applies its significant and unfettered discretion to Ms. Issak's speech, chilling and abridging Ms. Issak's speech, in violation of her First Amendment rights.

309. Absent Court intervention, the IRB, pursuant to its custom or policy, will have unconstitutionally conditioned Ms. Issak's ability to obtain a PhD on Ms. Issak forfeiting her First Amendment rights.

310. Pursuant to its custom or policy, the IRB applies the IRB Mandate's unconstitutional content-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

311. Pursuant to its custom or policy, the IRB applies the IRB Mandate's unconstitutional speaker-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

312. Pursuant to its custom or policy, the IRB applies the IRB Mandate's unconstitutional viewpoint-based regulation of speech to Ms. Issak, violating Ms. Issak's First Amendment rights.

313. The IRB lacks a compelling governmental interest to justify the IRB Mandate, as applied to Ms. Issak.

314. The IRB Mandate, as applied to Ms. Issak, is not narrowly tailored to any governmental interest.

315. Ms. Issak seeks prospective equitable relief in the form of a declaratory judgment holding that the IRB Mandate, when applied to social science communicative research that is not funded by the federal government, constitutes an unconstitutional abridgement of free speech in violation of the First Amendment, and entry of a permanent injunction barring the IRB from applying the IRB Mandate to Ms. Issak's speech based on research she conducted while a PhD student.

316.    Ms. Issak seeks further prospective equitable relief enjoining the IRB from requiring Ms. Issak to obtain IRB approval to complete her field work, revise her dissertation, defend that revised dissertation, and publish her revised dissertation as the dissertation completed for her PhD.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor, granting the following relief:

(i)      Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional licensing scheme and prior restraint;

(ii)     Declaratory judgment declaring that the IRB Mandate grants the IRB unconstitutional discretion over the scope of research subject to its approval and over approvals of research applications;

(iii)    Declaratory judgment declaring that the IRB Mandate unconstitutionally chills Plaintiff's speech;

(iv)     Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional abridgement of Plaintiff's speech in violation of the First Amendment;

(v)      Declaratory judgment declaring that the IRB Mandate unconstitutionally conditioned Plaintiff's ability to obtain a PhD on her forfeiting her First Amendment rights;

(vi)     Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional content-based regulation of Plaintiff's speech;

(vii)    Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional speaker-based regulation of Plaintiff's speech;

(viii)   Declaratory judgment declaring that the IRB Mandate constitutes an unconstitutional viewpoint-based regulation of Plaintiff's speech;

(ix)    Injunctive relief enjoining the IRB, the University Official-Capacity Defendants, and the IRB Official-Capacity Defendants from applying the IRB Mandate to Ms. Issak's research to prevent her from speaking about information she gathered under the auspices of the University or from publishing a field research-based dissertation;

(x)     Injunctive relief requiring the University Official-Capacity Defendants to readmit Ms. Issak to the University for up to two years and allow her to complete her field work, revise her dissertation, defend that revised dissertation, and publish the revised dissertation as Ms. Issak's dissertation for her PhD.

(xi)    Nominal damages from the Individual Capacity Defendants of $1 per Defendant;

(xii)   An award of attorneys' fees and costs to Plaintiff; and

(xiii)  Such other and further relief as the Court deems just and appropriate.

Dated: June 15, 2026

/s/*Margot J. Cleveland*
Margot J. Cleveland (MI Bar No. P83564)*
Kaitlyn D. Schiraldi (TN Bar No. 039737)
Zhonette M. Brown (CO Bar No. 40011)*
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
Margot.Cleveland@ncla.legal

*Counsel for Plaintiff Idil Issak*
*Admitted *Pro Hac Vice*

58